TEAGUE *v.* LANE, DIRECTOR, ILLINOIS DEPART-
MENT OF CORRECTIONS, ET AL.

No. 87–5259. Argued October 4, 1988—Decided February 22, 1989

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and III, in which REHNQUIST, C. J., and WHITE, SCALIA, and KENNEDY, JJ., joined, the opinion of the Court with respect to Part II, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Parts IV and V, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined. WHITE, J., *post*, p. 316, and BLACKMUN, J., *post*, p. 318, filed opinions concurring in part and concurring in the judgment. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, in Part I of which BLACKMUN, J., joined, *post*, p. 318. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 326.

*Patricia Unsinn* argued the cause for petitioner. With her on the briefs were *Theodore A. Gottfried, Michael J. Pelletier,* and *Martin S. Carlson.*

*David E. Bindi*, Assistant Attorney General of Illinois, argued the cause for respondents. With him on the brief were *Neil F. Hartigan*, Attorney General, *Robert J. Ruiz*, Solicitor General, and *Terence M. Madsen* and *Marcia L. Friedl*, Assistant Attorneys General.*

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III, and an opinion with respect to Parts IV and V, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join.

In *Taylor* v. *Louisiana*, 419 U. S. 522 (1975), this Court held that the Sixth Amendment required that the jury venire be drawn from a fair cross section of the community. The Court stated, however, that "in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition." *Id.*, at 538. The principal question presented in this case is whether the Sixth Amendment's fair cross section requirement should now be extended to the petit jury. Because we adopt Justice Harlan's approach to retroactivity for cases on collateral review, we leave the resolution of that question for another day.

I

Petitioner, a black man, was convicted by an all-white Illinois jury of three counts of attempted murder, two counts of

---

*Briefs of *amici curiae* urging reversal were filed for the Lawyers' Committee for Civil Rights Under Law by *Barry Sullivan*, *Barry Levenstam*, *Conrad K. Harper*, *Stuart J. Land*, *Norman Redlich*, *William L. Robinson*, and *Judith A. Winston*; and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers*, *Charles Stephen Ralston*, *John A. Powell*, and *Steven R. Shapiro*.

*Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

armed robbery, and one count of aggravated battery. During jury selection for petitioner's trial, the prosecutor used all 10 of his peremptory challenges to exclude blacks. Petitioner's counsel used one of his 10 peremptory challenges to exclude a black woman who was married to a police officer. After the prosecutor had struck six blacks, petitioner's counsel moved for a mistrial. The trial court denied the motion. App. 2–3. When the prosecutor struck four more blacks, petitioner's counsel again moved for a mistrial, arguing that petitioner was "entitled to a jury of his peers." *Id.*, at 3. The prosecutor defended the challenges by stating that he was trying to achieve a balance of men and women on the jury. The trial court denied the motion, reasoning that the jury "appear[ed] to be a fair [one]." *Id.*, at 4.

On appeal, petitioner argued that the prosecutor's use of peremptory challenges denied him the right to be tried by a jury that was representative of the community. The Illinois Appellate Court rejected petitioner's fair cross section claim. *People* v. *Teague*, 108 Ill. App. 3d 891, 895–897, 439 N. E. 2d 1066, 1069–1071 (1982). The Illinois Supreme Court denied leave to appeal, and we denied certiorari. 464 U. S. 867 (1983).

Petitioner then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Illinois. Petitioner repeated his fair cross section claim, and argued that the opinions of several Justices concurring in, or dissenting from, the denial of certiorari in *McCray* v. *New York*, 461 U. S. 961 (1983), had invited a reexamination of *Swain* v. *Alabama*, 380 U. S. 202 (1965), which prohibited States from purposefully and systematically denying blacks the opportunity to serve on juries. He also argued, for the first time, that under *Swain* a prosecutor could be questioned about his use of peremptory challenges once he volunteered an explanation. The District Court, though sympathetic to petitioner's arguments, held that it was bound by *Swain* and Circuit precedent. App. 5–6.

On appeal, petitioner repeated his fair cross section claim and his *McCray* argument. A panel of the Court of Appeals agreed with petitioner that the Sixth Amendment's fair cross section requirement applied to the petit jury and held that petitioner had made out a prima facie case of discrimination. A majority of the judges on the Court of Appeals voted to rehear the case en banc, and the panel opinion was vacated. *United States ex rel. Teague* v. *Lane,* 779 F. 2d 1332 (CA7 1985) (en banc) (Cudahy, J., dissenting). Rehearing was postponed until after our decision in *Batson* v. *Kentucky,* 476 U. S. 79 (1986), which overruled a portion of *Swain.* After *Batson* was decided, the Court of Appeals held that petitioner could not benefit from the rule in that case because *Allen* v. *Hardy,* 478 U. S. 255 (1986) *(per curiam),* had held that *Batson* would not be applied retroactively to cases on collateral review. 820 F. 2d 832, 834, n. 4 (CA7 1987) (en banc). The Court of Appeals also held that petitioner's *Swain* claim was procedurally barred and in any event meritless. *Id.,* at 834, n. 6. The Court of Appeals rejected petitioner's fair cross section claim, holding that the fair cross section requirement was limited to the jury venire. *Id.,* at 834–843. Judge Cudahy dissented, arguing that the fair cross section requirement should be extended to the petit jury. *Id.,* at 844.

## II

Petitioner's first contention is that he should receive the benefit of our decision in *Batson* even though his conviction became final before *Batson* was decided. Before addressing petitioner's argument, we think it helpful to explain how *Batson* modified *Swain.* *Swain* held that a "State's purposeful or deliberate denial" to blacks of an opportunity to serve as jurors solely on account of race violates the Equal Protection Clause of the Fourteenth Amendment. 380 U. S., at 203–204. In order to establish a prima facie case of discrimination under *Swain,* a defendant had to demonstrate that the peremptory challenge system had been "perverted."

A defendant could raise an inference of purposeful discrimination if he showed that the prosecutor in the county where the trial was held "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," has been responsible for the removal of qualified blacks who had survived challenges for cause, with the result that no blacks ever served on petit juries. *Id.*, at 223.

In *Batson*, the Court overruled that portion of *Swain* setting forth the evidentiary showing necessary to make out a prima facie case of racial discrimination under the Equal Protection Clause. The Court held that a defendant can establish a prima facie case by showing that he is a "member of a cognizable racial group," that the prosecutor exercised "peremptory challenges to remove from the venire members of the defendant's race," and that those "facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." 476 U. S., at 96. Once the defendant makes out a prima facie case of discrimination, the burden shifts to the prosecutor "to come forward with a neutral explanation for challenging black jurors." *Id.*, at 97.

In *Allen* v. *Hardy*, the Court held that *Batson* constituted an "explicit and substantial break with prior precedent" because it overruled a portion of *Swain*. 478 U. S., at 258. Employing the retroactivity standard of *Linkletter* v. *Walker*, 381 U. S. 618, 636 (1965), the Court concluded that the rule announced in *Batson* should not be applied retroactively on collateral review of convictions that became final before *Batson* was announced. The Court defined final to mean a case "'where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before our decision in' *Batson* . . . ." 478 U. S., at 258, n. 1 (citation omitted).

Petitioner's conviction became final 2½ years prior to *Batson*, thus depriving petitioner of any benefit from the rule

announced in that case. Petitioner argues, however, that *Batson* should be applied retroactively to all cases pending on direct review at the time certiorari was denied in *McCray* because the opinions filed in *McCray* destroyed the precedential effect of *Swain*. Brief for Petitioner 23. The issue in *McCray* and its companion cases was whether the Constitution prohibited the use of peremptory challenges to exclude members of a particular group from the jury, based on the prosecutor's assumption that they would be biased in favor of other members of that same group. JUSTICES MARSHALL and BRENNAN dissented from the denial of certiorari, expressing the views that *Swain* should be reexamined and that the conduct complained of violated a defendant's Sixth Amendment right to be tried by an impartial jury drawn from a fair cross section of the community. 461 U. S., at 964–970. JUSTICES STEVENS, BLACKMUN, and Powell concurred in the denial of certiorari. They agreed that the issue was an important one, but stated that it was a "sound exercise of discretion for the Court to allow the various States to serve as laboratories in which the issue receives further study before it is addressed." *Id.*, at 963.

We reject the basic premise of petitioner's argument. As we have often stated, the "denial of a writ of certiorari imports no expression of opinion upon the merits of the case." *United States* v. *Carver*, 260 U. S. 482, 490 (1923) (Holmes, J.). Accord, *Hughes Tool Co.* v. *Trans World Airlines, Inc.*, 409 U. S. 363, 366, n. 1 (1973); *Brown* v. *Allen*, 344 U. S. 443, 489–497 (1953). The "variety of considerations [that] underlie denials of the writ," *Maryland* v. *Baltimore Radio Show*, 338 U. S. 912, 917 (1950) (opinion of Frankfurter, J.), counsels against according denials of certiorari any precedential value. Concomitantly, opinions accompanying the denial of certiorari cannot have the same effect as decisions on the merits. We find that *Allen* v. *Hardy* is dispositive, and that petitioner cannot benefit from the rule announced in *Batson*.

## III

Petitioner's second contention is that he has established a violation of the Equal Protection Clause under *Swain*. Recognizing that he has not shown any systematic exclusion of blacks from petit juries in case after case, petitioner contends that when the prosecutor volunteers an explanation for the use of his peremptory challenges, *Swain* does not preclude an examination of the stated reasons to determine the legitimacy of the prosecutor's motive. Brief for Petitioner 35 (citing *Batson*, 476 U. S., at 101, n. (WHITE, J., concurring)). See *Weathersby* v. *Morris*, 708 F. 2d 1493, 1495–1496 (CA9 1983) (supporting petitioner's interpretation of *Swain*), cert. denied, 464 U. S. 1046 (1984).

Petitioner candidly admits that he did not raise the *Swain* claim at trial or on direct appeal. Brief for Petitioner 38–39. Because of this failure, petitioner has forfeited review of the claim in the Illinois courts. "It is well established that 'where an appeal was taken from a conviction, the judgment of the reviewing court is *res judicata* as to all issues actually raised, and those that could have been presented but were not are deemed waived.'" *People* v. *Gaines*, 105 Ill. 2d 79, 87–88, 473 N. E. 2d 868, 873 (1984) (citation omitted), cert. denied, 471 U. S. 1131 (1985). The default prevents petitioner from raising the *Swain* claim in collateral proceedings under the Illinois Post-Conviction Hearing Act, Ill. Rev. Stat., ch. 38, ¶ 122–1 *et seq.* (1987), unless fundamental fairness requires that the default be overlooked. *People* v. *Brown*, 52 Ill. 2d 227, 230, 287 N. E. 2d 663, 665 (1972).

The fundamental fairness exception is a narrow one, and has been applied in limited circumstances. Compare *People* v. *Goerger*, 52 Ill. 2d 403, 406, 288 N. E. 2d 416, 418 (1972) (improper instruction on reasonable doubt "does not constitute such fundamental unfairness as to obviate the *res judicata* and waiver doctrines"), with *People* v. *Ikerd*, 47 Ill. 2d 211, 212, 265 N. E. 2d 120, 121 (1970) (fundamental fairness exception applies "where the right relied on has been

recognized for the first time after the direct appeal"), and *People* v. *Hamby*, 32 Ill. 2d 291, 294–295, 205 N. E. 2d 456, 458 (1965) (fundamental fairness exception applies to claims that defendant asked counsel to raise on direct appeal). It is clear that collateral relief would be unavailable to petitioner. See *People* v. *Beamon*, 31 Ill. App. 3d 145, 145–146, 333 N. E. 2d 575, 575–576 (1975) (abstract of decision) (not invoking fundamental fairness exception and holding that *Swain* claim not raised on direct appeal could not be raised for the first time in collateral proceedings). As a result, petitioner has exhausted his state remedies under 28 U. S. C. § 2254(b) with respect to the *Swain* claim. See *Engle* v. *Isaac*, 456 U. S. 107, 125–126, n. 28 (1982); *United States ex rel. Williams* v. *Brantley*, 502 F. 2d 1383, 1385–1386 (CA7 1974).

Under *Wainwright* v. *Sykes*, 433 U. S. 72, 87–91 (1977), petitioner is barred from raising the *Swain* claim in a federal habeas corpus proceeding unless he can show cause for the default and prejudice resulting therefrom. See *Engle* v. *Isaac, supra,* at 113–114, 117, 124–135 (applying procedural default rule to claim that had never been raised in state court). Petitioner does not attempt to show cause for his default. Instead, he argues that the claim is not barred because it was addressed by the Illinois Appellate Court. Cf. *Caldwell* v. *Mississippi*, 472 U. S. 320, 327–328 (1985). We cannot agree with petitioner's argument. The Illinois Appellate Court rejected petitioner's Sixth Amendment fair cross section claim *without* mentioning the Equal Protection Clause on which *Swain* was based or discussing whether *Swain* allows a prosecutor to be questioned about his use of peremptory challenges once he volunteers an explanation. See *People* v. *Teague*, 108 Ill. App. 3d, at 895–896, 439 N. E. 2d, at 1070. Accordingly, we hold that petitioner's *Swain* claim is procedurally barred, and do not address its merits.

Our application of the procedural default rule here is consistent with *Harris* v. *Reed, ante,* at 263, which holds that a "procedural default does not bar consideration of a federal

claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar" (citations and internal quotations omitted). The rule announced in *Harris* v. *Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding. It is simply inapplicable in a case such as this one, where the claim was never presented to the state courts. See *ante*, at 268–270 (O'CONNOR, J., concurring).

## IV

Petitioner's third and final contention is that the Sixth Amendment's fair cross section requirement applies to the petit jury. As we noted at the outset, *Taylor* expressly stated that the fair cross section requirement does not apply to the petit jury. See 419 U. S., at 538. Petitioner nevertheless contends that the *ratio decidendi* of *Taylor* cannot be limited to the jury venire, and he urges adoption of a new rule. Because we hold that the rule urged by petitioner should not be applied retroactively to cases on collateral review, we decline to address petitioner's contention.

## A

In the past, the Court has, without discussion, often applied a new constitutional rule of criminal procedure to the defendant in the case announcing the new rule, and has confronted the question of retroactivity later when a different defendant sought the benefit of that rule. See, *e. g., Brown* v. *Louisiana,* 447 U. S. 323 (1980) (addressing retroactivity of *Burch* v. *Louisiana,* 441 U. S. 130 (1979)); *Robinson* v. *Neil,* 409 U. S. 505 (1973) (addressing retroactivity of *Waller* v. *Florida,* 397 U. S. 387 (1970)); *Stovall* v. *Denno,* 388 U. S. 293 (1967) (addressing retroactivity of *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v. *California,* 388 U. S. 263 (1967)); *Tehan* v. *Shott,* 382 U. S. 406 (1966) (addressing retroactivity of *Griffin* v. *California,* 380 U. S. 609

(1965)). In several cases, however, the Court has addressed the retroactivity question in the very case announcing the new rule. See *Morrissey* v. *Brewer*, 408 U. S. 471, 490 (1972); *Witherspoon* v. *Illinois*, 391 U. S. 510, 523, n. 22 (1968). These two lines of cases do not have a unifying theme, and we think it is time to clarify how the question of retroactivity should be resolved for cases on collateral review.

The question of retroactivity with regard to petitioner's fair cross section claim has been raised only in an *amicus* brief. See Brief for Criminal Justice Legal Foundation as *Amicus Curiae* 22–24. Nevertheless, that question is not foreign to the parties, who have addressed retroactivity with respect to petitioner's *Batson* claim. See Brief for Petitioner 21–32; Brief for Respondent 31–38. Moreover, our *sua sponte* consideration of retroactivity is far from novel. In *Allen* v. *Hardy*, we addressed the retroactivity of *Batson* even though that question had not been presented by the petition for certiorari or addressed by the lower courts. See 478 U. S., at 261–262 (MARSHALL, J., dissenting). See also *Mapp* v. *Ohio*, 367 U. S. 643, 646, n. 3 (1961) (applying exclusionary rule to the States even although such a course of action was urged only by *amicus curiae*).

In our view, the question "whether a decision [announcing a new rule should] be given prospective or retroactive effect should be faced at the time of [that] decision." Mishkin, Foreword: the High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56, 64 (1965). Cf. *Bowen* v. *United States*, 422 U. S. 916, 920 (1975) (when "issues of both retroactivity and application of constitutional doctrine are raised," the retroactivity issue should be decided first). Retroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated. Thus, before deciding whether the fair cross section require-

ment should be extended to the petit jury, we should ask whether such a rule would be applied retroactively to the case at issue. This retroactivity determination would normally entail application of the *Linkletter* standard, but we believe that our approach to retroactivity for cases on collateral review requires modification.

It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. See, *e. g.*, *Rock* v. *Arkansas*, 483 U. S. 44, 62 (1987) (*per se* rule excluding all hypnotically refreshed testimony infringes impermissibly on a criminal defendant's right to testify on his behalf); *Ford* v. *Wainwright*, 477 U. S. 399, 410 (1986) (Eighth Amendment prohibits the execution of prisoners who are insane). To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final. See generally *Truesdale* v. *Aiken*, 480 U. S. 527, 528–529 (1987) (Powell, J., dissenting). Given the strong language in *Taylor* and our statement in *Akins* v. *Texas*, 325 U. S. 398, 403 (1945), that "[f]airness in [jury] selection has never been held to require proportional representation of races upon a jury," application of the fair cross section requirement to the petit jury would be a new rule.[1]

---

[1] The dissent asserts that petitioner's fair cross section claim does not embrace the concept of proportional representation on the petit jury. *Post*, at 340–342. Although petitioner disavows such representation at the beginning of his brief, he later advocates adoption of the standard set forth in *Duren* v. *Missouri*, 439 U. S. 357 (1979), as a way of determining whether there has been a violation of the fair cross section requirement. See Brief for Petitioner 15–16. In order to establish a prima facie violation of the fair cross section requirement under *Duren*, a defendant must show: (1) that the "group alleged to be excluded is a 'distinctive' group in the community"; (2) that the representation of the group "is not

Not all new rules have been uniformly treated for retroactivity purposes. Nearly a quarter of a century ago, in *Linkletter*, the Court attempted to set some standards by which to determine the retroactivity of new rules. The question in *Linkletter* was whether *Mapp* v. *Ohio*, which made the exclusionary rule applicable to the States, should be applied retroactively to cases on collateral review. The Court determined that the retroactivity of *Mapp* should be determined by examining the purpose of the exclusionary rule, the reliance of the States on prior law, and the effect on the administration of justice of a retroactive application of the exclusionary rule. Using that standard, the Court held that *Mapp* would only apply to trials commencing after that case was decided. 381 U. S., at 636–640.

The *Linkletter* retroactivity standard has not led to consistent results. Instead, it has been used to limit application of certain new rules to cases on direct review, other new rules only to the defendants in the cases announcing such rules, and still other new rules to cases in which trials have not yet commenced. See *Desist* v. *United States*, 394 U. S. 244, 256–257 (1969) (Harlan, J., dissenting) (citing examples).

---

fair and reasonable in relation to the number of such persons in the community"; and (3) that the underrepresentation of the group "is due to systematic exclusion of the group in the jury-selection process." 439 U. S., at 364. The second prong of *Duren* is met by demonstrating that the group is underrepresented in proportion to its position in the community as documented by census figures. *Id.*, at 364–366. If petitioner must meet this prong of *Duren* to prevail, it is clear that his fair cross section claim is properly characterized as requiring "fair and reasonable" proportional representation on the petit jury. Petitioner recognizes this, as he compares the percentage of blacks in his petit jury to the percentage of blacks in the population of Cook County, Illinois, from which the petit jury was drawn. See Brief for Petitioner 17–18 (arguing that blacks were underrepresented on petitioner's petit jury by 25.62%). In short, the very standard that petitioner urges us to adopt includes, and indeed requires, the sort of proportional analysis we declined to endorse in *Akins* v. *Texas*, 325 U. S. 398, 403 (1945), and *Taylor* v. *Louisiana*, 419 U. S. 522, 538 (1975).

Not surprisingly, commentators have "had a veritable field day" with the *Linkletter* standard, with much of the discussion being "more than mildly negative." Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va. L. Rev. 1557, 1558, and n. 3 (1975) (citing sources).

Application of the *Linkletter* standard led to the disparate treatment of similarly situated defendants on direct review. For example, in *Miranda* v. *Arizona*, 384 U. S. 436, 467–473 (1966), the Court held that, absent other effective measures to protect the Fifth Amendment privilege against self-incrimination, a person in custody must be warned prior to interrogation that he has certain rights, including the right to remain silent. The Court applied that new rule to the defendants in *Miranda* and its companion cases, and held that their convictions could not stand because they had been interrogated without the proper warnings. *Id.*, at 491–499. In *Johnson* v. *New Jersey*, 384 U. S. 719, 733–735 (1966), the Court held, under the *Linkletter* standard, that *Miranda* would only be applied to trials commencing after that decision had been announced. Because the defendant in *Johnson*, like the defendants in *Miranda*, was on direct review of his conviction, see 384 U. S., at 721, the Court's refusal to give *Miranda* retroactive effect resulted in unequal treatment of those who were similarly situated. This inequity also generated vehement criticism. See, *e. g.*, A. Bickel, The Supreme Court and the Idea of Progress 54–57 (1978) (decrying the "plain" injustice in *Johnson* and suggesting that the Court should have distinguished between direct and collateral review for purposes of retroactivity).

Dissatisfied with the *Linkletter* standard, Justice Harlan advocated a different approach to retroactivity. He argued that new rules should always be applied retroactively to cases on direct review, but that generally they should not be applied retroactively to criminal cases on collateral review. See *Mackey* v. *United States*, 401 U. S. 667, 675 (1971) (opin-

ion concurring in judgments in part and dissenting in part); *Desist*, 394 U. S., at 256 (dissenting opinion).

In *Griffith* v. *Kentucky*, 479 U. S. 314 (1987), we rejected as unprincipled and inequitable the *Linkletter* standard for cases pending on direct review at the time a new rule is announced, and adopted the first part of the retroactivity approach advocated by Justice Harlan. We agreed with Justice Harlan that "failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." 479 U. S., at 322. We gave two reasons for our decision. First, because we can only promulgate new rules in specific cases and cannot possibly decide all cases in which review is sought, "the integrity of judicial review" requires the application of the new rule to "all similar cases pending on direct review." *Id.*, at 323. We quoted approvingly from Justice Harlan's separate opinion in *Mackey, supra*, at 679:

> " 'If we do not resolve all cases before us on direct review in light of our best understanding of governing constitutional principles, it is difficult to see why we should so adjudicate any case at all. . . . In truth, the Court's assertion of power to disregard current law in adjudicating cases before us that have not already run the full course of appellate review is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation.' " 479 U. S., at 323.

Second, because "selective application of new rules violates the principle of treating similarly situated defendants the same," we refused to continue to tolerate the inequity that resulted from not applying new rules retroactively to defendants whose cases had not yet become final. *Id.*, at 323–324 (citing *Desist, supra*, at 258–259 (Harlan, J., dissenting)). Although new rules that constituted clear breaks with the past generally were not given retroactive effect under the *Linkletter* standard, we held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all

cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." 479 U. S., at 328.

The *Linkletter* standard also led to unfortunate disparity in the treatment of similarly situated defendants on collateral review. An example will best illustrate the point. In *Edwards* v. *Arizona*, 451 U. S. 477, 484–487 (1981), the Court held that once a person invokes his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be inferred from the fact that the person responded to police-initiated questioning. It was not until *Solem* v. *Stumes*, 465 U. S. 638 (1984), that the Court held, under the *Linkletter* standard, that *Edwards* was not to be applied retroactively to cases on collateral review. In the interim, several lower federal courts had come to the opposite conclusion and had applied *Edwards* to cases that had become final before that decision was announced. See *Witt* v. *Wainwright*, 714 F. 2d 1069, 1072–1074 (CA11 1983); *Sockwell* v. *Maggio*, 709 F. 2d 341, 343–344 (CA5 1983); *McCree* v. *Housewright*, 689 F. 2d 797, 800–802 (CA8 1982), cert. denied *sub nom. McCree* v. *Lockhart*, 460 U. S. 1088 (1983). Thus, some defendants on collateral review whose *Edwards* claims were adjudicated prior to *Stumes* received the benefit of *Edwards*, while those whose *Edwards* claims had not been addressed prior to *Stumes* did not. This disparity in treatment was a product of two factors: our failure to treat retroactivity as a threshold question and the *Linkletter* standard's inability to account for the nature and function of collateral review. Having decided to rectify the first of those inadequacies, see *supra*, at 300–301, we now turn to the second.

## B

Justice Harlan believed that new rules generally should not be applied retroactively to cases on collateral review. He argued that retroactivity for cases on collateral review could "be responsibly [determined] only by focusing, in the first in-

stance, on the nature, function, and scope of the adjudicatory process in which such cases arise. The relevant frame of reference, in other words, is not the purpose of the new rule whose benefit the [defendant] seeks, but instead the purposes for which the writ of habeas corpus is made available." *Mackey*, 401 U. S., at 682 (opinion concurring in judgments in part and dissenting in part). With regard to the nature of habeas corpus, Justice Harlan wrote:

> "Habeas corpus always has been a *collateral* remedy, providing an avenue for upsetting judgments that have become otherwise final. It is not designed as a substitute for direct review. The interest in leaving concluded litigation in a state of repose, that is, reducing the controversy to a final judgment not subject to further judicial revision, may quite legitimately be found by those responsible for defining the scope of the writ to outweigh in some, many, or most instances the competing interest in readjudicating convictions according to all legal standards in effect when a habeas petition is filed." *Id.* at 682–683.

Given the "broad scope of constitutional issues cognizable on habeas," Justice Harlan argued that it is "sounder, in adjudicating habeas petitions, generally to apply the law prevailing at the time a conviction became final than it is to seek to dispose of [habeas] cases on the basis of intervening changes in constitutional interpretation." *Id.*, at 689. As he had explained in *Desist*, "the threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards. In order to perform this deterrence function, . . . the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place." 394 U. S., at 262–263. See also *Stumes*, 465 U. S., at 653 (Powell, J., concurring in judgment) ("Review on habeas to determine that the conviction rests upon correct application of the

law in effect at the time of the conviction is all that is required to 'forc[e] trial and appellate courts . . . to toe the constitutional mark'") (citation omitted).

Justice Harlan identified only two exceptions to his general rule of nonretroactivity for cases on collateral review. First, a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Mackey*, 401 U. S., at 692. Second, a new rule should be applied retroactively if it requires the observance of "those procedures that . . . are 'implicit in the concept of ordered liberty.'" *Id.*, at 693 (quoting *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937) (Cardozo, J.)).

Last Term, in *Yates* v. *Aiken*, 484 U. S. 211 (1988), we were asked to decide whether the rule announced in *Francis* v. *Franklin*, 471 U. S. 307 (1985), should be applied to a defendant on collateral review at the time that case was decided. We held that *Francis* did not announce a new rule because it "was merely an application of the principle that governed our decision in *Sandstrom* v. *Montana* [,442 U. S. 510 (1979)], which had been decided before [the defendant's] trial took place." 484 U. S., at 216–217. We therefore found it unnecessary to adopt Justice Harlan's view of retroactivity for cases on collateral review. We stated, however, that our recent decisions had noted, as had Justice Harlan, "the important distinction between direct review and collateral review." *Id.*, at 215. See also *Pennsylvania* v. *Finley*, 481 U. S. 551, 555 (1987) (distinguishing between direct and collateral review for purposes of Sixth Amendment right to counsel on appeal). Indeed, we have expressly reconciled some of our retroactivity decisions with Justice Harlan's approach. See *Shea* v. *Louisiana*, 470 U. S. 51, 58, n. 4 (1985) (giving *Edwards* retroactive effect on direct, but not collateral, review "is fully congruent with both aspects of the approach to retroactivity propounded by Justice Harlan").

We agree with Justice Harlan's description of the function of habeas corpus. "[T]he Court never has defined the scope of the writ simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error." *Kuhlmann* v. *Wilson*, 477 U. S. 436, 447 (1986) (plurality opinion). Rather, we have recognized that interests of comity and finality must also be considered in determining the proper scope of habeas review. Thus, if a defendant fails to comply with state procedural rules and is barred from litigating a particular constitutional claim in state court, the claim can be considered on federal habeas only if the defendant shows cause for the default and actual prejudice resulting therefrom. See *Wainwright* v. *Sykes*, 433 U. S., at 87–91. We have declined to make the application of the procedural default rule dependent on the magnitude of the constitutional claim at issue, see *Engle* v. *Isaac*, 456 U. S., at 129, or on the State's interest in the enforcement of its procedural rule, see *Murray* v. *Carrier*, 477 U. S. 478, 493–496 (1986).

This Court has not "always followed an unwavering line in its conclusions as to the availability of the Great Writ. Our development of the law of federal habeas corpus has been attended, seemingly, with some backing and filling." *Fay* v. *Noia*, 372 U. S. 391, 411–412 (1963). See also *Stone* v. *Powell*, 428 U. S. 465, 475–476 (1976). Nevertheless, it has long been established that a final civil judgment entered under a given rule of law may withstand subsequent judicial change in that rule. In *Chicot County Drainage District* v. *Baxter State Bank*, 308 U. S. 371 (1940), the Court held that a judgment based on a jurisdictional statute later found to be unconstitutional could have res judicata effect. The Court based its decision in large part on finality concerns. "The actual existence of a statute, prior to such a determination [of unconstitutionality], is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judical declaration. . . . Questions of

. . . prior determinations deemed to have finality and acted upon accordingly . . . demand examination." *Id.*, at 374. Accord, *Rooker* v. *Fidelity Trust Co.*, 263 U. S. 413, 415 (1923) ("Unless and until . . . reversed or modified" on appeal, an erroneous constitutional decision is "an effective and conclusive adjudication"); *Thompson* v. *Tolmie*, 2 Pet. 157, 169 (1829) (errors or mistakes of court with competent jurisdiction "cannot be corrected or examined when brought up collaterally").

These underlying considerations of finality find significant and compelling parallels in the criminal context. Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect. The fact that life and liberty are at stake in criminal prosecutions "shows only that 'conventional notions of finality' should not have *as much* place in criminal as in civil litigation, not that they should have *none*." Friendly, Is Innocence Irrelevant? Collateral Attacks on Criminal Judgments, 38 U. Chi. L. Rev. 142, 150 (1970). "[I]f a criminal judgment is ever to be final, the notion of legality must at some point include the assignment of final competence to determine legality." Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 450–451 (1963) (emphasis omitted). See also *Mackey*, 401 U. S., at 691 (Harlan, J., concurring in judgments in part and dissenting in part) ("No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation").

As explained by Professor Mishkin:

> "From this aspect, the *Linkletter* problem becomes not so much one of prospectivity or retroactivity of the rule but rather of the availability of collateral attack—in

[that] case federal habeas corpus—to go behind the otherwise final judgment of conviction. . . . For the potential availability of collateral attack is what created the 'retroactivity' problem of *Linkletter* in the first place; there seems little doubt that without that possibility the Court would have given short shrift to any arguments for 'prospective limitation' of the *Mapp* rule." Foreword, 79 Harv. L. Rev., at 77–78 (footnote omitted).

See also Bender, The Retroactive Effect of an Overruling Constitutional Decision: *Mapp* v. *Ohio*, 110 U. Pa. L. Rev. 650, 655–656 (1962).

The "costs imposed upon the State[s] by retroactive application of new rules of constitutional law on habeas corpus . . . generally far outweigh the benefits of this application." *Stumes*, 465 U. S., at 654 (Powell, J., concurring in judgment). In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, cf. *Younger* v. *Harris*, 401 U. S. 37, 43–54 (1971), for it *continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards. Furthermore, as we recognized in *Engle* v. *Isaac*, "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." 456 U. S., at 128, n. 33. See also *Brown* v. *Allen*, 344 U. S., at 534 (Jackson, J., concurring in result) (state courts cannot "anticipate, and so comply with, this Court's due process requirements or ascertain any standards to which this Court will adhere in prescribing them").

We find these criticisms to be persuasive, and we now adopt Justice Harlan's view of retroactivity for cases on collateral review. Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.

## V

Petitioner's conviction became final in 1983. As a result, the rule petitioner urges would not be applicable to this case, which is on collateral review, unless it would fall within an exception.

The first exception suggested by Justice Harlan—that a new rule should be applied retroactively if it places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," *Mackey*, 401 U. S., at 692 (opinion concurring in judgments in part and dissenting in part)—is not relevant here. Application of the fair cross section requirement to the petit jury would not accord constitutional protection to any primary activity whatsoever.

The second exception suggested by Justice Harlan—that a new rule should be applied retroactively if it requires the observance of "those procedures that . . . are 'implicit in the concept of ordered liberty,'" *id.*, at 693 (quoting *Palko*, 302 U. S., at 325)—we apply with a modification. The language used by Justice Harlan in *Mackey* leaves no doubt that he meant the second exception to be reserved for watershed rules of criminal procedure:

> "Typically, it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the *bedrock procedural elements* that must be found to vitiate the fairness of a particular conviction. For example, such, in my view, is the case with the right to counsel at trial now held a necessary condition precedent to any conviction

for a serious crime." 401 U. S., at 693–694 (emphasis added).

In *Desist*, Justice Harlan had reasoned that one of the two principal functions of habeas corpus was "to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted," and concluded "from this that all 'new' constitutional rules which significantly improve the pre-existing factfinding procedures are to be retroactively applied on habeas." 394 U. S., at 262. In *Mackey*, Justice Harlan gave three reasons for shifting to the less defined *Palko* approach. First, he observed that recent precedent, particularly *Kaufman* v. *United States*, 394 U. S. 217 (1969) (permitting Fourth Amendment claims to be raised on collateral review), led "ineluctably . . . to the conclusion that it is not a principal purpose of the writ to inquire whether a criminal convict did in fact commit the deed alleged." 401 U. S., at 694. Second, he noted that cases such as *Coleman* v. *Alabama*, 399 U. S. 1 (1970) (invalidating lineup procedures in the absence of counsel), gave him reason to doubt the marginal effectiveness of claimed improvements in factfinding. 401 U. S., at 694–695. Third, he found "inherently intractable the purported distinction between those new rules that are designed to improve the factfinding process and those designed principally to further other values." *Id.*, at 695.

We believe it desirable to combine the accuracy element of the *Desist* version of the second exception with the *Mackey* requirement that the procedure at issue must implicate the fundamental fairness of the trial. Were we to employ the *Palko* test without more, we would be doing little more than importing into a very different context the terms of the debate over incorporation. Compare *Duncan* v. *Louisiana*, 391 U. S. 145, 171–193 (1968) (Harlan, J., dissenting), with *Adamson* v. *California*, 332 U. S. 46, 68–92 (1947) (Black, J., dissenting). Reviving the *Palko* test now, in this area of law, would be unnecessarily anachronistic. Cf. *Benton* v.

*Maryland*, 395 U. S. 784, 794–795 (1969) (overruling *Palko* and incorporating the Double Jeopardy Clause). Moreover, since *Mackey* was decided, our cases have moved in the direction of reaffirming the relevance of the likely accuracy of convictions in determining the available scope of habeas review. See, *e. g., Kuhlmann* v. *Wilson*, 477 U. S., at 454 (plurality opinion) (a successive habeas petition may be entertained only if the defendant makes a "colorable claim of factual innocence"); *Murray* v. *Carrier*, 477 U. S., at 496 ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default"); *Stone* v. *Powell*, 428 U. S., at 491–492, n. 31 (removing Fourth Amendment claims from the scope of federal habeas review if the State has provided a full and fair opportunity for litigation creates no danger of denying a "safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty"). Finally, we believe that Justice Harlan's concerns about the difficulty in identifying both the existence and the value of accuracy-enhancing procedural rules can be addressed by limiting the scope of the second exception to those new procedures without which the likelihood of an accurate conviction is seriously diminished.

Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge. We are also of the view that such rules are "best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus—that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of perjured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods." *Rose* v.

*Lundy,* 455 U. S. 509, 544 (1982) (STEVENS, J., dissenting) (footnotes omitted).[2]

An examination of our decision in *Taylor* applying the fair cross section requirement to the jury venire leads inexorably to the conclusion that adoption of the rule petitioner urges would be a far cry from the kind of absolute prerequisite to fundamental fairness that is "implicit in the concept of ordered liberty." The requirement that the jury venire be composed of a fair cross section of the community is based on the role of the jury in our system. Because the purpose of the jury is to guard against arbitrary abuses of power by interposing the commonsense judgment of the community between the State and the defendant, the jury venire cannot be composed only of special segments of the population. "Community participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor,* 419 U. S., at 530. But as we stated in *Daniel* v. *Louisiana,* 420 U. S. 31, 32 (1975), which held that *Taylor* was not to be given retroactive effect, the fair cross section requirement "[does] not

---

[2] Because petitioner is not under sentence of death, we need not, and do not, express any views as to how the retroactivity approach we adopt today is to be applied in the capital sentencing context. We do, however, disagree with JUSTICE STEVENS' suggestion that the finality concerns underlying Justice Harlan's approach to retroactivity are limited to "making convictions final," and are therefore "wholly inapplicable to the capital sentencing context." *Post,* at 321, n. 3. As we have often stated, a criminal judgment necessarily includes the sentence imposed upon the defendant. See generally *Flynt* v. *Ohio,* 451 U. S. 619, 620 (1981) *(per curiam).* Collateral challenges to the sentence in a capital case, like collateral challenges to the sentence in a noncapital case, delay the enforcement of the judgment at issue and decrease the possibility that "there will at some point be the certainty that comes with an end to litigation." *Sanders* v. *United States,* 373 U. S. 1, 25 (1963) (Harlan, J., dissenting). Cf. U. S. Dept. of Justice, Bureau of Justice Statistics, Capital Punishment 1987, p. 9 (1988) (table 10) (for the 10-year period from 1977–1987, the average elapsed time from the imposition of a capital sentence to execution was 77 months).

rest on the premise that every criminal trial, or any particular trial, [is] necessarily unfair because it [is] not conducted in accordance with what we determined to be the requirements of the Sixth Amendment." Because the absence of a fair cross section on the jury venire does not undermine the fundamental fairness that must underlie a conviction or seriously diminish the likelihood of obtaining an accurate conviction, we conclude that a rule requiring that petit juries be composed of a fair cross section of the community would not be a "bedrock procedural element" that would be retroactively applied under the second exception we have articulated.

Were we to recognize the new rule urged by petitioner in this case, we would have to give petitioner the benefit of that new rule even though it would not be applied retroactively to others similarly situated. In the words of JUSTICE BRENNAN, such an inequitable result would be "an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum." *Stovall* v. *Denno*, 388 U. S., at 301. But the harm caused by the failure to treat similarly situated defendants alike cannot be exaggerated: such inequitable treatment "hardly comports with the ideal of 'administration of justice with an even hand.'" *Hankerson* v. *North Carolina*, 432 U. S. 233, 247 (1977) (Powell, J., concurring in judgment) (quoting *Desist*, 394 U. S., at 255 (Douglas, J., dissenting)). See also *Fuller* v. *Alaska*, 393 U. S. 80, 82 (1968) (Douglas, J., dissenting) (if a rule is applied to the defendant in the case announcing the rule, it should be applied to all others similarly situated). Our refusal to allow such disparate treatment in the direct review context led us to adopt the first part of Justice Harlan's retroactivity approach in *Griffith*. "The fact that the new rule may constitute a clear break with the past has no bearing on the 'actual inequity that results' when only one of many similarly situated defendants receives the benefit of the new rule." 479 U. S., at 327–328.

If there were no other way to avoid rendering advisory opinions, we might well agree that the inequitable treatment described above is "an insignificant cost for adherence to sound principles of decision-making." *Stovall* v. *Denno*, 388 U. S., at 301. But there is a more principled way of dealing with the problem. We can simply refuse to announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to all others similarly situated. Cf. *Bowen* v. *United States*, 422 U. S., at 920 ("This Court consistently has declined to address unsettled questions regarding the scope of decisions establishing new constitutional doctrine in cases in which it holds those decisions nonretroactive. This practice is rooted in our reluctance to decide constitutional questions unnecessarily") (citations omitted). We think this approach is a sound one. Not only does it eliminate any problems of rendering advisory opinions, it also avoids the inequity resulting from the uneven application of new rules to similarly situated defendants. We therefore hold that, implicit in the retroactivity approach we adopt today, is the principle that habeas corpus cannot be used as a vehicle to create new constitutional rules of criminal procedure unless those rules would be applied retroactively to *all* defendants on collateral review through one of the two exceptions we have articulated. Because a decision extending the fair cross section requirement to the petit jury would not be applied retroactively to cases on collateral review under the approach we adopt today, we do not address petitioner's claim.

For the reasons set forth above, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE WHITE, concurring in part and concurring in the judgment.

I join Parts I, II, and III of JUSTICE O'CONNOR's opinion. Otherwise, I concur only in the judgment.

Our opinion in *Stovall* v. *Denno*, 388 U. S. 293, 297 (1967), authored by JUSTICE BRENNAN, articulated a three-factor formula for determining the retroactivity of decisions changing the constitutional rules of criminal procedure. The formula, which applied whether a case was on direct review or arose in collateral proceedings, involved consideration of the purpose of the new rule, the extent of reliance on the old rule, and the effect on the administration of justice of retroactive application of the new rule. In a series of cases, however, the Court has departed from *Stovall* and has held that decisions changing the governing rules in criminal cases will be applied retroactively to all cases then pending on direct review, *e. g.*, *United States* v. *Johnson*, 457 U. S. 537 (1982); *Shea* v. *Louisiana*, 470 U. S. 51 (1985); *Griffith* v. *Kentucky*, 479 U. S. 314 (1987). I dissented in those cases, believing that *Stovall* was the sounder approach. Other Justices, including the CHIEF JUSTICE and JUSTICE O'CONNOR, joined my dissents in those cases. The CHIEF JUSTICE indicated in *Shea* and *Griffith*, and JUSTICE O'CONNOR has now concluded, that the *Stovall* formula should also be abandoned in cases where convictions have become final and the issue of retroactivity arises in collateral proceedings.

I regret the course the Court has taken to this point, but cases like *Johnson*, *Shea*, and *Griffith* have been decided, and I have insufficient reason to continue to object to them. In light of those decisions, the result reached in Parts IV and V of JUSTICE O'CONNOR's opinion is an acceptable application in collateral proceedings of the theories embraced by the Court in cases dealing with direct review, and I concur in that result. If we are wrong in construing the reach of the habeas corpus statutes, Congress can of course correct us; but because the Court's recent decisions dealing with direct review appear to have constitutional underpinnings, see *e. g.*, *Griffith* v. *Kentucky, supra*, at 322–323, correction of our error, if error there is, perhaps lies with us, not Congress.

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Part I of JUSTICE STEVENS' opinion, *post* this page and 319–323, concurring in part and concurring in the judgment. So far as the petitioner's claim based upon *Swain* v. *Alabama*, 380 U. S. 202 (1965), is concerned, I concur in the judgment.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins as to Part I, concurring in part and concurring in the judgment.

I

For the reasons stated in Part III of JUSTICE BRENNAN's dissent, *post*, at 342, I am persuaded this petitioner has alleged a violation of the Sixth Amendment.[1] I also believe the Court should decide that question in his favor. I do not agree with JUSTICE O'CONNOR's assumption that a ruling in petitioner's favor on the merits of the Sixth Amendment issue would require that his conviction be set aside. See *ante*, at 300, 315.

When a criminal defendant claims that a procedural error tainted his conviction, an appellate court often decides whether error occurred before deciding whether that error requires reversal or should be classified as harmless. I would follow a parallel approach in cases raising novel questions of constitutional law on collateral review, first deter-

---

[1] Of course the Constitution does not require that every 12-person jury proportionally represent a "fair cross section" of the community. See *ante*, at 299. But as JUSTICE BRENNAN points out, *post*, at 341, and n. 8, petitioner does not claim such an entitlement. Petitioner does possess a right to have his petit jury selected by procedures that are "impartial." See U. S. Const., Amdt. 6 ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . ."). It is clear to me that a procedure that allows a prosecutor to exclude all black venirepersons, without any reason for the exclusions other than their race appearing in the record, does not comport with the Sixth Amendment's impartiality requirement.

mining whether the trial process violated any of the petitioner's constitutional rights and then deciding whether the petitioner is entitled to relief. If error occurred, factors relating to retroactivity—most importantly, the magnitude of unfairness—should be examined before granting the petitioner relief. Proceeding in reverse, a plurality of the Court today declares that a new rule should not apply retroactively without ever deciding whether there is such a rule.[2]

In general, I share Justice Harlan's views about retroactivity. See *Mackey* v. *United States*, 401 U. S. 667, 675–702 (1971) (opinion concurring in judgments in part and dissenting in part); *Desist* v. *United States*, 394 U. S. 244, 256–269 (1969) (dissenting opinion). Thus I joined the Court in holding that, as Justice Harlan had urged, new criminal procedural rules should be applied to all defendants whose convictions are not final when the rule is announced. *Griffith* v. *Kentucky*, 479 U. S. 314 (1987). I also agree with Justice Harlan that defendants seeking collateral review should not benefit from new rules unless those rules "fre[e] individuals from punishment for conduct that is constitutionally protected" or unless the original trial entailed elements of fundamental unfairness. *Mackey*, *supra*, at 693. Thus, although I question the propriety of making such an important change in the law without briefing or argument, cf. *Allen* v. *Hardy*,

---

[2] The plurality states that retroactivity questions ought to be decided at the same time a new rule of criminal procedure is announced. See *ante*, at 300. I agree that this should be the approach in most instances. By declaring retroactivity to be the "threshold question," *ibid.*, however, the plurality inverts the proper order of adjudication. Among other things, until a rule is set forth, it would be extremely difficult to evaluate whether the rule is "new" at all. If it is not, of course, no retroactivity question arises. See, *e. g.*, *Yates* v. *Aiken*, 484 U. S. 211 (1988); *Lee* v. *Missouri*, 439 U. S. 461 (1979) *(per curiam);* accord, *ante*, at 300, 307. I note too that in *Witherspoon* v. *Illinois*, 391 U. S. 510, 523, n. 22 (1968), which the plurality cites to support its simultaneous decision guideline, retroactivity was addressed only after establishment of the new constitutional rule.

478 U. S. 255, 261–262 (1986) (MARSHALL, J., dissenting), I am persuaded that the Court should adopt Justice Harlan's analysis of retroactivity for habeas corpus cases as well for cases still on direct review. See *ante*, at 305–310.

I do not agree, however, with the plurality's dicta proposing a "modification" of Justice Harlan's fundamental fairness exception. See *ante*, at 311–316. "[I]t has been the law, presumably for at least as long as anyone currently in jail has been incarcerated," Justice Harlan wrote, "that procedures utilized to convict them must have been fundamentally fair, that is, in accordance with the command of the Fourteenth Amendment that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Mackey*, 401 U. S., at 689. He continued:

> "[T]he writ ought always to lie for claims of nonobservance of those procedures that, as so aptly described by Mr. Justice Cardozo in *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937), are 'implicit in the concept of ordered liberty.' Typically, it should be the case that any conviction free from federal constitutional error at the time it became final, will be found, upon reflection, to have been fundamentally fair and conducted under those procedures essential to the substance of a full hearing. However, in some situations it might be that time and growth in social capacity, as well as judicial perceptions of what we can rightly demand of the adjudicatory process, will properly alter our understanding of the bedrock procedural elements that must be found to vitiate the fairness of a particular conviction." *Id.*, at 693.

In embracing Justice Cardozo's notion that errors "violat[ing] those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions,'" *Palko* v. *Connecticut*, 302 U. S. 319, 328 (1937) (quoting *Hebert*

v. *Louisiana*, 272 U. S. 312, 316 (1926)), must be rectified, Justice Harlan expressly rejected a previous statement linking the fundamental fairness exception to factual innocence. *Mackey, supra*, at 694; see *Desist, supra*, at 262.

The plurality wrongly resuscitates Justice Harlan's early view, indicating that the only procedural errors deserving correction on collateral review are those that undermine "an accurate determination of innocence or guilt . . . ." See *ante*, at 313. I cannot agree that it is "unnecessarily anachronistic," *ante*, at 312, to issue a writ of habeas corpus to a petitioner convicted in a manner that violates fundamental principles of liberty. Furthermore, a touchstone of factual innocence would provide little guidance in certain important types of cases, such as those challenging the constitutionality of capital sentencing hearings.[3] Even when assessing er-

---

[3] A major reason that Justice Harlan espoused limited retroactivity in collateral proceedings was the interest in making convictions final, an interest that is wholly inapplicable to the capital sentencing context. As he explained:

"It is, I believe, a matter of fundamental import that there be a visible end to the litigable aspect of the criminal process. Finality in the criminal law is an end which must always be kept in plain view. See, *e. g., Fay* v. *Noia*, 372 U. S.[ 391,] 445 [(1963)] (Clark, J., dissenting); *Spencer* v. *Texas*, 385 U. S. 554, 583 (1967) (Warren, C. J., concurring and dissenting). See also Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441 (1963); Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 146–151 (1970). As I have stated before, 'Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community.' *Sanders* v. *United States*, 373 U. S.[ 1,] 24–25 [(1963)] (Harlan, J., dissenting). At some point, the criminal process, if it is to function at all, must turn its attention from whether a man ought properly to be incarcerated to how he is to be treated once convicted. If law, criminal or otherwise, is worth having and enforcing, it must at some time provide a definitive answer to the questions litigants present or else it never provides an answer at all. Surely it is an unpleasant task to strip a

rors at the guilt phase of a trial, factual innocence is too capricious a factor by which to determine if a procedural change is sufficiently *"bedrock"* or "watershed" to justify application of the fundamental fairness exception. See *ante*, at 311. In contrast, given our century-old proclamation that the Constitution does not allow exclusion of jurors because of race, *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), a rule promoting selection of juries free from racial bias clearly implicates concerns of fundamental fairness.

As a matter of first impression, therefore, I would conclude that a guilty verdict delivered by a jury whose impartiality might have been eroded by racial prejudice is fundamentally unfair. Constraining that conclusion is the Court's holding in *Allen* v. *Hardy*, 478 U. S. 255 (1986) *(per curiam)*—an opinion I did not join—that *Batson* v. *Kentucky*, 476 U. S. 79 (1986), cannot be applied retroactively to permit collateral review of convictions that became final before it was decided. It is true that the *Batson* decision rested on the Equal Protection Clause of the Fourteenth Amendment and that this case raises a Sixth Amendment issue. In both cases, however, petitioners pressed their objections to the jury selection on both grounds. See *ante*, at 293; *Batson* v. *Kentucky, supra*, at 83. Both cases concern the constitutionality of allowing the use of peremptories to yield a jury that may be biased against a defendant on account of race. Identical practical ramifications will ensue from our holdings in both cases. Thus if there is no fundamental unfairness in denying retroactive relief to a petitioner denied his Fourteenth Amendment right to a fairly chosen jury, as the Court

man of his freedom and subject him to institutional restraints. But this does not mean that in so doing, we should always be halting or tentative. No one, not criminal defendants, not the judicial system, not society as a whole is benefited by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation on issues already resolved." *Mackey* v. *United States*, 401 U. S. 667, 690–691 (1971) (opinion concurring in judgments in part and dissenting in part).

held in *Allen*,[4] there cannot be fundamental unfairness in denying this petitioner relief for the violation of his Sixth Amendment right to an impartial jury. I therefore agree that the judgment of the Court of Appeals must be affirmed.[5]

## II

I do not, however, agree with the Court's disposition of the contention that the prosecutor violated the Equal Protection Clause by using peremptory challenges to exclude black persons from petitioner's jury. *Ante*, at 297–299. The basis for this claim is *Swain* v. *Alabama*, 380 U. S. 202 (1965), which reaffirmed that equal protection requires that jurors "'be selected as individuals, on the basis of individual qualifications, and not as members of a race.'" *Id.*, at 204 (quoting *Cassell* v. *Texas*, 339 U. S. 282, 286 (1950) (plurality opinion)). Discussing how a defendant might prove purposeful racial discrimination in jury selection, the Court stated:

> "In the light of the purpose of the peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the Constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were re-

---

[4] Cf. *Rose* v. *Lundy*, 455 U. S. 509, 544, n. 8 (1982) (STEVENS, J., dissenting) ("In ruling that a constitutional principle is not to be applied retroactively, the Court implicitly suggests that the right is not necessary to ensure the integrity of the underlying judgment; the Court certainly would not allow claims of such magnitude to remain unremedied").

[5] In addition, because I agree that the opinions in *McCray* v. *New York*, 461 U. S. 961 (1983), do not afford petitioner a ground for retroactive application of *Batson* v. *Kentucky*, 476 U. S. 79 (1986), I join Part II of this Court's opinion.

moved from the jury or that they were removed because they were Negroes." 380 U. S., at 222.

The Court of Appeals rejected petitioner's claim because he "did not specifically raise [it] in the state court," 820 F. 2d 832, 834, n. 6 (CA7 1987) (en banc), and because he had not rebutted the *Swain* presumption by "show[ing] the prosecutor's systematic use of peremptory challenges against Negroes over a period of time." 380 U. S., at 227. It thus ignored the import of petitioner's claim; *i. e.*, that a prosecutor who volunteers explanations for using peremptories erases the *Swain* presumption, so that the trial judge should examine whether the race-neutral explanations are genuine or pretextual.

Petitioner's trial counsel twice moved for a mistrial on the ground that the prosecutor impermissibly had exercised peremptory challenges to effect an all-white jury. The prosecutor responded that "numerous individuals that were excused were of very young years. There was an attempt, your Honor, to have a balance of an equal number of men and women . . . ." App. 3.[6] With little comment the trial court

---

[6] The colloquy surrounding the second motion for mistrial, made after the jury had been selected, was as follows:

"MR. MOTTA [defense counsel]: As the Court is aware State exercised 10 peremptory challenges and each challenge excused a black person. I feel that my client is entitled to a jury of his peers, your Honor. I feel that he is being denied this. I would ask the Court for a mistrial.

"MR. ANGAROLA [prosecutor]: We exercised more than 10 challenges. In fact we exercised 11 challenges and didn't just excuse black individuals. Counsel is incorrect when he stat[e]s that.

"In fact, your Honor, one of the challenges, peremptory challenges exercised was against a white woman. In addition, your Honor, numerous individuals that were excused were of very young years. There was an attempt, your Honor, to have a balance of an equal number of men and women as the jury is now comprised there are seven men and five women sitting on the jury.

"We feel that counsel's motion is totally improper.

"MR. MOTTA: If I may respond to that briefly, your Honor, State exercised 10 peremptory challenges, all of 10 black people were excused; that

denied the mistrial motions. There is substantial force to petitioner's argument that the volunteered explanations made this more than the "ordinary exercise of challenges" to which *Swain*'s systematic proof requirement applies, *Swain, supra,* at 227, and that the trial court erred by failing to scrutinize the prosecutor's excuses.[7]

I note, however, that petitioner never presented his *Swain* claim to the state courts before including it in the instant federal habeas petition. In *Rose* v. *Lundy,* 455 U. S. 509 (1982), the Court announced that a habeas petition containing exhausted and unexhausted claims must be dismissed. Literal adherence to that pronouncement would require that this case be remanded to the District Court with instructions to dismiss the petition without consideration of the exhausted Sixth Amendment claim. The Court avoids this result by

their one peremptory challenge for an alternate juror excused, I believe, a white woman. I think the record will reflect that ages and background of the individuals that were excused. They were all to sit on the regular jury. I am not talking about the alternate, the one white alternate that was excused by the State.

"MR. ANGAROLA: As your Honor previously pointed out, counsel himself excluded a black, Mrs. McCleary, your Honor, who was a black individual who was accepted by the People, and he excused her.

"THE COURT: Counsel, I feel that it would appear that the jury appears to be a fair jury. I will deny your motion." App. 3–4.

[7] Recently the Court of Appeals for the Eighth Circuit employed this theory to hold that a prosecutor's volunteering of explanations for his use of peremptory challenges overcame the *Swain* presumption. *Garrett* v. *Morris,* 815 F. 2d 509, cert. denied *sub nom. Jones* v. *Garrett,* 484 U. S. 898 (1987). Upon examination the court concluded that the explanations were pretexts for purposeful discrimination; therefore, it remanded for retrial or release of the petitioner on a writ of habeas corpus. 815 F. 2d, at 514. See also *Weathersby* v. *Morris,* 708 F. 2d 1493 (CA9 1983), cert. denied, 464 U. S. 1046 (1984). Cf. *Batson, supra,* at 101, n. (WHITE, J., concurring) ("Nor would it have been inconsistent with *Swain* for the trial judge to invalidate peremptory challenges of blacks if the prosecutor, in response to an objection to his strikes, stated that he struck blacks because he believed they were not qualified to serve as jurors, especially in the trial of a black defendant").

holding that "petitioner has forfeited review of the claim in the Illinois courts" and thus exhausted his state remedies. *Ante*, at 297. It is true that "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Harris* v. *Reed*, *ante*, at 263, n. 9 (citing *Castille* v. *Peoples*, *post*, at 351; *ante*, at 298). I am by no means convinced, however, that the Illinois courts would not conclude that petitioner's *Swain* claim falls within their fundamental fairness exception to their ban on collateral review of claims that are otherwise waived. Thus, in the absence of any "plain statement" by the Illinois courts, cf. *Michigan* v. *Long*, 463 U. S. 1032, 1041 (1983), we should let the Illinois judiciary decide whether there is a procedural default that forecloses review of that claim. Until those courts have spoken, I would treat petitioner's *Swain* claim as an unexhausted claim that is not ripe for review on federal habeas.

Because "the exhaustion rule requiring dismissal of mixed petitions . . . is not jurisdictional," *Strickland* v. *Washington*, 466 U. S. 668, 684 (1984), and because petitioner's Sixth Amendment claim is foreclosed by the decision in *Allen*, I concur in the Court's judgment.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today a plurality of this Court, without benefit of briefing and oral argument, adopts a novel threshold test for federal review of state criminal convictions on habeas corpus. It does so without regard for—indeed, without even mentioning—our contrary decisions over the past 35 years delineating the broad scope of habeas relief. The plurality further appears oblivious to the importance we have consistently accorded the principle of *stare decisis* in nonconstitutional cases. Out of an exaggerated concern for treating similarly situated habeas petitioners the same, the plurality would for the first time preclude the federal courts from considering on collateral review a vast range of important constitutional

challenges; where those challenges have merit, it would bar the vindication of personal constitutional rights and deny society a check against further violations until the same claim is presented on direct review. In my view, the plurality's "blind adherence to the principle of treating like cases alike" amounts to "letting the tail wag the dog" when it stymies the resolution of substantial and unheralded constitutional questions. *Griffith* v. *Kentucky*, 479 U. S. 314, 332 (1987) (WHITE, J., dissenting). Because I cannot acquiesce in this unprecedented curtailment of the reach of the Great Writ, particularly in the absence of any discussion of these momentous changes by the parties or the lower courts, I dissent.

## I

The federal habeas corpus statute provides that a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U. S. C. § 2254.[1] For well over a century, we have read this statute and its forbears to authorize federal courts to grant writs of habeas corpus whenever a person's liberty is unconstitutionally restrained. Shortly after the Habeas Corpus Act of 1867, ch. 27, 14 Stat. 385, empowered federal courts to issue writs of habeas corpus to state authorities, we noted: "This legislation is of the most comprehensive character. It brings within the *habeas corpus* jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the National Constitution, treaties,

---

[1] Prisoners sentenced by a *federal* court may seek to have their sentences vacated, corrected, or set aside "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U. S. C. § 2255. The plurality does not address the question whether the rule it announces today extends to claims brought by federal, as well as state, prisoners.

or laws. It is impossible to widen this jurisdiction." *Ex parte McCardle*, 6 Wall. 318, 325–326 (1868). See also *Fay* v. *Noia*, 372 U. S. 391, 426 (1963) ("Congress in 1867 sought to provide a federal forum for state prisoners having constitutional defenses by extending the habeas corpus powers of the federal courts to their constitutional maximum"). Nothing has happened since to persuade us to alter that judgment. Our thorough survey in *Fay* v. *Noia* of the history of habeas corpus at common law and in its federal statutory embodiment led us to conclude that "conventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review." *Id.*, at 424. In *Noia* we therefore held that federal courts have the power to inquire into any constitutional defect in a state criminal trial, provided that the petitioner remains "in custody" by virtue of the judgment rendered at that trial. Our subsequent rulings have not departed from that teaching in cases where the presentation of a petitioner's claim on collateral review is not barred by a procedural default. See, *e. g., Rose* v. *Mitchell*, 443 U. S. 545, 550–565 (1979); *Jackson* v. *Virginia*, 443 U. S. 307, 320–324 (1979).

In particular, our decisions have made plain that the federal courts may collaterally review claims such as Teague's once state remedies have been exhausted. In *Brown* v. *Allen*, 344 U. S. 443 (1953), for example, we held that state prisoners alleging discrimination in the selection of members of the grand jury that indicted them and the petit jury that tried them were entitled to reconsideration of those allegations in federal court. "Discriminations against a race by barring or limiting citizens of that race from participation in jury service," we noted, "are odious to our thought and our Constitution. This has long been accepted as the law." *Id.*, at 470 (citations omitted). See also *Vasquez* v. *Hillery*, 474 U. S. 254 (1986); *Rose* v. *Mitchell, supra.*

Our precedents thus supply no support for the plurality's curtailment of habeas relief.[2]  Just as it was "a fortuity that we overruled *Swain* v. *Alabama*, 380 U. S. 202 (1965) [which set forth an unduly strict standard for proving that a prosecutor's use of peremptory challenges was racially discriminatory in violation of the Equal Protection Clause], in a case that came to us on direct review" when "[w]e could as easily

---

[2] Until today, this Court has imposed but one substantive limitation on the cognizability of habeas claims.  In *Stone* v. *Powell*, 428 U. S. 465 (1976), the Court held that where a State has provided a defendant with an opportunity for full and fair litigation of a claim that evidence used against him was obtained through an unlawful search or seizure in violation of the Fourth Amendment, he may not relitigate that claim on federal habeas. The Court noted, however, that "Fourth Amendment violations are different in kind from denials of Fifth or Sixth Amendment rights," *id.*, at 479, and it expressly stated that its decision was "*not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally," in substantial part because "the exclusionary rule is a judicially created remedy rather than a personal constitutional right." *Id.*, at 495, n. 37.  None of the Court's reasoning in *Stone* v. *Powell* supports the plurality's present decision not to adjudicate Teague's claim, because Teague is attempting to vindicate what he alleges is a fundamental personal right, rather than trying to invoke a prophylactic rule devised by this Court to deter violations of personal constitutional rights by law enforcement officials.  In cases of this kind, our reluctance to allow federal courts to interfere with state criminal processes has never been deemed paramount. See *Vasquez* v. *Hillery*, 474 U. S. 254, 262 (1986); *Rose* v. *Mitchell*, 443 U. S. 545, 584, n. 6 (1979) (Powell, J., concurring in judgment).

Our ruling in *Rose* v. *Mitchell*, *supra*, confirms this conclusion.  We there rejected the argument that our holding in *Stone* v. *Powell* should be extended to preclude federal habeas review of claims of racial discrimination in the selection of members of a state grand jury, notwithstanding the fact that the selection of petit jurors was free from constitutional infirmity and that guilt was established beyond a reasonable doubt at a trial devoid of constitutional error.  Teague's challenge to the composition of the petit jury is perforce on even firmer ground.  See also *Kimmelman* v. *Morrison*, 477 U. S. 365 (1986) (counsel's failure to litigate competently petitioner's Fourth Amendment claim cognizable on habeas); *Jackson* v. *Virginia*, 443 U. S. 307, 320–324 (1979) (sufficiency of the evidence claims may be brought on habeas).

have granted certiorari and decided the matter in a case on collateral review," *Griffith* v. *Kentucky*, 479 U. S., at 332 (WHITE, J., dissenting), so too there is no reason why we cannot decide Teague's almost identical claim under the Sixth Amendment on collateral review rather than in a case on direct review. Because there is no basis for extending the Court's rationale in *Stone* v. *Powell*, 428 U. S. 465 (1976), to preclude review of Teague's challenge to the composition of the jury that convicted him, and because I perceive no other ground consistent with our precedents for limiting the cognizability of constitutional claims on federal habeas corpus, I would reach the merits of Teague's Sixth Amendment argument and hold in his favor.

## II

Unfortunately, the plurality turns its back on established case law and would erect a formidable new barrier to relief. Any time a federal habeas petitioner's claim, if successful, would result in the announcement of a new rule of law, the plurality says, it may only be adjudicated if that rule would "plac[e] 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,'" *ante*, at 307, quoting *Mackey* v. *United States*, 401 U. S. 667, 692 (1971) (Harlan, J., concurring in judgments in part and dissenting in part), or if it would mandate "new procedures without which the likelihood of an accurate conviction is seriously diminished." *Ante*, at 313.

## A

Astonishingly, the plurality adopts this novel precondition to habeas review without benefit of oral argument on the question and with no more guidance from the litigants than a three-page discussion in an *amicus* brief. See Brief for Criminal Justice Legal Foundation as *Amicus Curiae* 22–24.[3]

---

[3] As the plurality points out, *ante*, at 300, our decision in *Allen* v. *Hardy*, 478 U. S. 255 (1986) *(per curiam)*, addressed the retroactive application of our holding in *Batson* v. *Kentucky*, 476 U. S. 79 (1986), even

Although the plurality's approach builds upon two opinions written by Justice Harlan some years ago, see *Mackey* v. *United States, supra,* at 675 (opinion concurring in judgments in part and dissenting in part); *Desist* v. *United States,* 394 U. S. 244, 256 (1969) (dissenting opinion), it declines fully to embrace his views. No briefing or argument at all was devoted to the points at which the plurality departs from his proposals. It is indeed ironic that in endorsing the bulk of Justice Harlan's approach to the provision of federal habeas relief, the Court ignores his reminder that our "obligation of orderly adherence to our own processes would demand that we seek that aid which adequate briefing and argument lends to the determination of an important issue." *Mapp* v. *Ohio,* 367 U. S. 643, 677 (1961) (dissenting opinion). Before breaking so sharply with precedent, the plurality would have done well, I think, to recall what we said in *Ladner* v. *United States,* 358 U. S. 169, 173 (1958): "The question of the scope of collateral attack upon criminal sentences is an important and complex one . . . . We think that we should have the benefit of a full argument before dealing with the question."

B

Equally disturbing, in my view, is the plurality's infidelity to the doctrine of *stare decisis*. That doctrine "demands respect in a society governed by the rule of law," *Akron* v.

---

though the petition for certiorari in that case did not discuss that issue. Our decision in *Allen,* however, applied settled retroactivity doctrine; unlike the plurality's opinion today, it did not announce a sharp break with past practice. And although the course we followed in *Mapp* v. *Ohio,* 367 U. S. 643 (1961), was urged on us by *amicus* rather than by the parties themselves, incorporation of the protections of the Bill of Rights through the Fourteenth Amendment was by no means a novel step at that time, and the relevant issues were familiar from our prior cases. Nor does the fact that the parties here debated the extent to which *Batson* should be applied retroactively diminish the startling abruptness of the plurality's action, for the adoption of a version of Justice Harlan's approach to retroactivity to bar habeas review of most claims that would result in new rules of law if they prevailed was *not even mentioned* by the parties.

*Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 419–420 (1983), because it enhances the efficiency of judicial decisionmaking, allowing judges to rely on settled law without having to reconsider the wisdom of prior decisions in every case they confront, and because it fosters predictability in the law, permitting litigants and potential litigants to act in the knowledge that precedent will not be overturned lightly and ensuring that they will not be treated unfairly as a result of frequent or unanticipated changes in the law. We have therefore routinely imposed on those asking us to overrule established lines of cases "the heavy burden of persuading the Court that changes in society or in the law dictate that the values served by *stare decisis* yield in favor of a greater objective." *Vasquez* v. *Hillery*, 474 U. S., at 266.

In this case, as when we considered the reviewability of grand jury discrimination on habeas corpus, "we have been offered no reason to believe that any such metamorphosis has rendered the Court's long commitment to a rule of reversal outdated, ill-founded, unworkable, or otherwise legitimately vulnerable to serious reconsideration." *Vasquez* v. *Hillery*, *supra*, at 266. None of the reasons we have hitherto deemed necessary for departing from the doctrine of *stare decisis* are present. Our interpretations of the reach of federal habeas corpus have not proceeded from inadequate briefing or argumentation, nor have they taken the form of assertion unaccompanied by detailed justification. See, *e. g.*, *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 766 (1984). No new facts or arguments have come to light suggesting that our reading of the federal habeas statute or our divination of congressional intent was plainly mistaken. See, *e. g.*, *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978). In addition, Congress has done nothing to shrink the set of claims cognizable on habeas since it passed the Habeas Corpus Act of 1867, despite our consistent interpretation of the federal habeas statute to permit adjudication of

cases like Teague's. Finally, the rationale for our decisions has not been undermined by subsequent congressional or judicial action. See, *e. g.*, *Braden* v. *30th Judicial Circuit Court of Kentucky*, 410 U. S. 484, 497–499 (1973). None of the exceptions to the doctrine of *stare decisis* we have recognized apply. I therefore remain mystified at where the plurality finds warrant to upset, *sua sponte*, our time-honored precedents.

## C

The plurality does not so much as mention *stare decisis*. Indeed, from the plurality's exposition of its new rule, one might infer that its novel fabrication will work no great change in the availability of federal collateral review of state convictions. Nothing could be further from the truth. Although the plurality declines to "define the spectrum of what may or may not constitute a new rule for retroactivity purposes," it does say that generally "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Ante*, at 301. Otherwise phrased, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Ibid.* This account is extremely broad.[4] Few decisions on appeal or collateral review are *"dictated"* by what came before. Most such cases involve a question of law that is at least debatable, permitting a rational judge to resolve the case in more than one way. Virtually no case that prompts a dissent on the relevant legal point, for example, could be said to be *"dictated"* by prior decisions. By the plurality's test, therefore,

---

[4] Compare Justice Stewart's much more restrained approach in *Milton* v. *Wainwright*, 407 U. S. 371 (1972): "An issue of the 'retroactivity' of a decision of this Court is not even presented unless the decision in question marks a sharp break in the web of the law. The issue is presented only when the decision overrules clear past precedent, or disrupts a practice long accepted and widely relied upon." *Id.*, at 381, n. 2 (dissenting opinion) (citations omitted).

334

a great many cases could only be heard on habeas if the rule urged by the petitioner fell within one of the two exceptions the plurality has sketched. Those exceptions, however, are narrow. Rules that place " 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe,' " *ante*, at 307, quoting *Mackey* v. *United States*, 401 U. S., at 692 (Harlan, J., concurring in judgments in part and dissenting in part), are rare. And rules that would require "new procedures without which the likelihood of an accurate conviction is seriously diminished," *ante*, at 313, are not appreciably more common. The plurality admits, in fact, that it "believe[s] it unlikely that many such components of basic due process have yet to emerge." *Ibid.* The plurality's approach today can thus be expected to contract substantially the Great Writ's sweep.

Its impact is perhaps best illustrated by noting the abundance and variety of habeas cases we have decided in recent years that could never have been adjudicated had the plurality's new rule been in effect. Although "history reveals no exact tie of the writ of habeas corpus to a constitutional claim relating to innocence or guilt," *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 257 (1973) (Powell, J., concurring), the plurality's decision to ignore history and to link the availability of relief to guilt or innocence when the outcome of a case is not *"dictated"* by precedent would apparently prevent a great many Fifth, Sixth, and Fourteenth Amendment cases from being brought on federal habeas.

For example, in *Nix* v. *Whiteside*, 475 U. S. 157 (1986), the Court ruled that a defendant's right to counsel under the Sixth Amendment is not violated when a defense attorney refuses to cooperate with him in presenting perjured testimony at trial. Clearly, the *opposite* result sought by the petitioner could not have been dictated by prior cases, nor would the introduction of perjured testimony have improved the accuracy of factfinding at trial. The claim presented on habeas was therefore novel yet well outside the plurality's

exceptions. Were the claim raised tomorrow on federal collateral review, a court could not reach the merits, as did we. The same is true of numerous right-to-counsel and representation claims we have decided where the wrong alleged by the habeas petitioner was unlikely to have produced an erroneous conviction. See, *e. g.*, *Moran* v. *Burbine*, 475 U. S. 412 (1986) (failure of police to inform defendant that attorney retained for him by somebody else sought to reach him does not violate Sixth Amendment); *McKaskle* v. *Wiggins*, 465 U. S. 168 (1984) (*pro se* defendant's right to conduct own defense not violated by unsolicited participation of standby counsel); *Jones* v. *Barnes*, 463 U. S. 745 (1983) (appellate defense counsel does not have Sixth Amendment duty to raise every nonfrivolous issue requested by defendant); *Morris* v. *Slappy*, 461 U. S. 1 (1983) (state court's denial of continuance until public defender initially assigned to represent defendant became available does not violate Sixth Amendment); *Wainwright* v. *Torna*, 455 U. S. 586 (1982) *(per curiam)* (no deprivation of right to counsel when defense attorney failed to make timely filing of application for certiorari in state court); *Moore* v. *Illinois*, 434 U. S. 220 (1977) (Sixth Amendment violated by corporeal identification conducted after initiation of adversary criminal proceedings in the absence of counsel); *Ross* v. *Moffitt*, 417 U. S. 600 (1974) (States need not provide indigent defendants with counsel on discretionary appeals).

Likewise, because "the Fifth Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth," *Tehan* v. *Shott*, 382 U. S. 406, 416 (1966), claims that a petitioner's right to remain silent was violated would, if not dictated by earlier decisions, ordinarily fail to qualify under the plurality's second exception. In *Estelle* v. *Smith*, 451 U. S. 454 (1981), for example, we held that a psychiatrist who examined the defendant before trial without warning him that what he said could be used against him in a capital sentencing proceeding could not testify against him at such a proceeding. Under the plurality's newly fashioned

rule, however, we could not have decided that case on the merits. The result can hardly be said to have been compelled by existing case law, see *id.*, at 475 (REHNQUIST, J., concurring in judgment), and the exclusion of such testimony at sentencing cannot have influenced the jury's determination of the defendant's guilt or enhanced the likely accuracy of his sentence.[5] Nor is *Estelle* v. *Smith* unique in that respect. See, *e. g.*, *Greer* v. *Miller*, 483 U. S. 756 (1987) (single question by prosecutor during cross-examination concerning defendant's postarrest silence does not violate Fifth Amendment); *Moran* v. *Burbine, supra* (failure of police to inform defendant of efforts of attorney to reach him does not vitiate waiver of *Miranda* rights); *Fletcher* v. *Weir*, 455 U. S. 603 (1982) *(per curiam)* (prosecutor's use of defendant's postarrest silence for impeachment purposes does not constitute due process violation when defendant did not receive *Miranda* warnings during the period of his postarrest silence); *Jenkins* v. *Anderson*, 447 U. S. 231 (1980) (Fifth Amendment not violated by prosecutor's use of prearrest silence to impeach defendant's credibility).

Habeas claims under the Double Jeopardy Clause will also be barred under the plurality's approach if the rules they seek to establish would "brea[k] new ground or impos[e] a new obligation on the States or the Federal Government," *ante*, at 301, because they bear no relation to the petitioner's

---

[5] In "limiting the scope of the second exception to those new procedures without which the likelihood of an accurate conviction is seriously diminished," *ante*, at 313, the plurality presumably intends the exception to cover claims that involve the accuracy of the defendant's sentence as well as the accuracy of a court's determination of his guilt. See *Smith* v. *Murray*, 477 U. S. 527, 538 (1986) (no "fundamental miscarriage of justice" where introduction of testimony at sentencing phase of capital case "neither precluded the development of true facts nor resulted in the admission of false ones"). Thus, the plurality's new rule apparently would not prevent capital defendants, for example, from raising Eighth Amendment, due process, and equal protection challenges to capital sentencing procedures on habeas corpus.

guilt or innocence. See, *e. g.*, *Crist* v. *Bretz*, 437 U. S. 28 (1978) (state law providing that jeopardy does not attach until first juror is sworn is unconstitutional); *Chaffin* v. *Stynchcombe*, 412 U. S. 17 (1973) (rendition of higher sentence by jury upon retrial does not violate Double Jeopardy Clause). So, too, will miscellaneous due process and Sixth Amendment claims that relate only tangentially to a defendant's guilt or innocence. See, *e. g.*, *Bordenkircher* v. *Hayes*, 434 U. S. 357 (1978) (no due process violation when prosecutor carries out threat to reindict on stiffer charge); *Barker* v. *Wingo*, 407 U. S. 514 (1972) (5-year delay does not violate right to speedy trial). And of course cases closely related to Teague's, such as *Lockhart* v. *McCree*, 476 U. S. 162 (1986), where we held that the removal for cause of so-called "*Witherspoon*-excludables" does not violate the Sixth Amendment's fair cross section requirement, would be beyond the purview of this Court when they arrived on habeas.

### D

These are massive changes, unsupported by precedent.[6] They also lack a reasonable foundation. By exaggerating the importance of treating like cases alike and granting relief to all identically positioned habeas petitioners or none, "the Court acts as if it has no choice but to follow a mechanical notion of fairness without pausing to consider 'sound principles

---

[6] The plurality's claim that "our cases have moved in the direction of reaffirming the relevance of the likely accuracy of convictions in determining the available scope of habeas review," *ante*, at 313, has little force. Two of the cases it cites—*Kuhlmann* v. *Wilson*, 477 U. S. 436, 454 (1986) (plurality opinion), and *Murray* v. *Carrier*, 477 U. S. 478 (1986)—discuss the conditions under which a habeas petitioner may obtain review even though his claim would otherwise be procedurally barred. They do not hold that a petitioner's likely guilt or innocence bears on the cognizability of habeas claims in the absence of procedural default. And the Court has limited *Stone* v. *Powell*, 428 U. S. 465 (1976), as noted above, see *supra*, at 328–330, and n. 2, to Fourth Amendment exclusionary rule claims, passing up several opportunities to extend it.

of decisionmaking.'" *Griffith* v. *Kentucky*, 479 U. S., at
332–333 (WHITE, J., dissenting), quoting *Stovall* v. *Denno*,
388 U. S. 293, 301 (1967). Certainly it is desirable, in the
interest of fairness, to accord the same treatment to all ha-
beas petitioners with the same claims. Given a choice be-
tween deciding an issue on direct or collateral review that
might result in a new rule of law that would not warrant ret-
roactive application to persons on collateral review other
than the petitioner who brought the claim, we should ordi-
narily grant certiorari and decide the question on direct
review. Following our decision in *Griffith* v. *Kentucky*,
*supra*, a new rule would apply equally to all persons whose
convictions had not become final before the rule was an-
nounced, whereas habeas petitioners other than the one
whose case we decided might not benefit from such a rule if
we adopted it on collateral review. Taking cases on direct
review ahead of those on habeas is especially attractive
because the retrial of habeas petitioners usually places a
heavier burden on the States than the retrial of persons on
direct review. Other things being equal, our concern for
fairness and finality ought to therefore lead us to render our
decision in a case that comes to us on direct review.

Other things are not always equal, however. Sometimes a
claim which, if successful, would create a new rule not appro-
priate for retroactive application on collateral review is bet-
ter presented by a habeas case than by one on direct review.
In fact, sometimes the claim is *only* presented on collateral
review. In that case, while we could forgo deciding the issue
in the hope that it would eventually be presented squarely on
direct review, that hope might be misplaced, and even if it
were in time fulfilled, the opportunity to check constitutional
violations and to further the evolution of our thinking in some
area of the law would in the meanwhile have been lost. In
addition, by preserving our right and that of the lower fed-
eral courts to hear such claims on collateral review, we would
not discourage their litigation on federal habeas corpus and

thus not deprive ourselves and society of the benefit of decisions by the lower federal courts when we must resolve these issues ourselves.

The plurality appears oblivious to these advantages of our settled approach to collateral review. Instead, it would deny itself these benefits because adherence to precedent would occasionally result in one habeas petitioner's obtaining redress while another petitioner with an identical claim could not qualify for relief.[7] In my view, the uniform treatment of habeas petitioners is not worth the price the plurality is willing to pay. Permitting the federal courts to decide novel habeas claims not substantially related to guilt or innocence has profited our society immensely. Congress has not seen fit to withdraw those benefits by amending the statute that provides for them. And although a favorable decision for a petitioner might not extend to another prisoner whose identical claim has become final, it is at least arguably better that the wrong done to one person be righted than that none of the injuries inflicted on those whose convictions have become final be redressed, despite the resulting inequality in treatment. I therefore adhere to what we said in *Stovall* v. *Denno, supra,* where we held that the rules we laid down in *United States* v. *Wade,* 388 U. S. 218 (1967), and *Gilbert* v.

---

[7] The plurality's complaint that prior retroactivity decisions have sometimes led to more than one habeas petitioner's reaping the benefit of a new rule while most habeas petitioners obtained no relief because of "our failure to treat retroactivity as a threshold question," *ante,* at 305, is misguided. The disparity resulting from our deciding three years later, in *Solem* v. *Stumes,* 465 U. S. 638 (1984), not to apply retroactively the rule of *Edwards* v. *Arizona,* 451 U. S. 477, 484–487 (1981), should not be ascribed to our failure to make retroactivity a threshold question, but rather to our failure to decide the retroactivity question *at the same time* that we decided the merits issue. If both decisions are made contemporaneously, see, *e. g., Witherspoon* v. *Illinois,* 391 U. S. 510, 523, n. 22 (1968); *Stovall* v. *Denno,* 388 U. S. 293 (1967), then only one exception need be made to the rule of equal treatment. The plurality may find even this slight inequality unacceptable, but the magnitude of the disparity is not, and need not be, as large as its example suggests.

*California,* 388 U. S. 263 (1967), should not be applied retroactively:

> "We recognize that Wade and Gilbert are, therefore, the only victims of pretrial confrontations in the absence of their counsel to have the benefit of the rules established in their cases. That they must be given that benefit is, however, an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum. Sound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies, and in the possible effect upon the incentive of counsel to advance contentions requiring a change in the law, militate against denying Wade and Gilbert the benefit of today's decisions. Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making." *Id.,* at 301 (footnotes omitted).

I see no reason to abandon these views. Perfectly even-handed treatment of habeas petitioners can by no means justify the plurality's *sua sponte* renunciation of the ample benefits of adjudicating novel constitutional claims on habeas corpus that do not bear substantially on guilt or innocence.

### III

Even if one accepts the plurality's account of the appropriate limits to habeas relief, its conclusion that Teague's claim may not be heard is dubious. The plurality seeks to give its decision a less startling aspect than it wears by repeatedly mischaracterizing Teague's Sixth Amendment claim. As the plurality would have it, Teague contends "'that petit juries actually chosen must mirror the community and reflect the

various distinctive groups in the population,'" *ante*, at 292, quoting *Taylor* v. *Louisiana*, 419 U. S. 522, 538 (1975), and that fairness in jury selection "'require[s] proportional representation of races upon a jury.'" *Ante*, at 301, quoting *Akins* v. *Texas*, 325 U. S. 398, 403 (1945). Teague, however, makes no such claim—which is presumably why the plurality quotes dicta from other cases rather than Teague's brief. He submits, rather, that "the Sixth Amendment guarantees the accused a jury selected in accordance with procedures that allow a *fair possibility* for the jury to reflect a cross section of the community." Brief for Petitioner 4 (emphasis added). Indeed, Teague specifically disavows the position attributed to him by the plurality: "The defendant is not entitled to a jury of any particular composition and no requirement exists that the petit jury mirror the distinctive groups in the population . . . ." *Ibid.* Teague's claim is simply that the Sixth Amendment's command that no distinctive groups be systematically excluded from jury pools, *Taylor* v. *Louisiana, supra,* or from venires drawn from them, *Duren* v. *Missouri,* 439 U. S. 357 (1979), applies with equal force to the selection of petit juries. He maintains that this firmly established principle prohibits the prosecution from using its peremptory challenges discriminatorily to prevent venirepersons from sitting on the jury merely because they belong to some racial, ethnic, or other group cognizable for Sixth Amendment purposes. Teague's claim is therefore closely akin to that which prevailed in *Batson* v. *Kentucky,* 476 U. S. 79 (1986), where we held that the Equal Protection Clause prohibits the prosecution from using its peremptory challenges to exclude venirepersons from the jury solely because they share the defendant's race. The only potentially significant difference is that Teague's claim, if valid, would bar the prosecution from excluding venirepersons from the petit jury on account of their membership in some cognizable group even when the defendant is not himself a member of that group, whereas the Equal Protection Clause might not

provide a basis for relief unless the defendant himself belonged to the group whose members were improperly excluded.[8]

Once Teague's claim is characterized correctly, the plurality's assertions that on its new standard his claim is too novel to be recognized on habeas corpus, *ante*, at 301, and that the right he invokes is "a far cry from the kind of absolute prerequisite to fundamental fairness that is 'implicit in the concept of ordered liberty,'" *ante*, at 314, are dubious. The requirement Teague asks us to impose does not go far beyond our mandates in *Taylor*, *Duren*, and *Batson*; indeed, it flows quite naturally from those decisions. The fact that the Sixth Amendment would permit a challenge by a defendant who did not belong to a cognizable group whose members were discriminatorily excluded from the jury does not alter that conclusion. As we said in *Rose* v. *Mitchell*, 443 U. S., at 555–556:

> "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service of Negroes, *or any group otherwise qualified to serve*, impairs the confidence of the public in the administration of justice. As this Court repeatedly has

[8]The plurality's persistent misreading of Teague's claim, *ante*, at 301–302, n. 1, is puzzling. To be sure, Teague does argue that the principles informing our decision in *Duren* v. *Missouri*, 439 U. S. 357 (1979), should be extended to the selection of the petit jury. But *Duren* does *not* require that every venire provide a microcosm of the community; it demands, instead, that no group be systematically excluded from venires unless a significant state interest would thereby be manifestly and primarily advanced. Lack of proportional representation of a cognizable group on a given petit jury, in Teague's view, helps to establish a prima facie Sixth Amendment violation; contrary to the plurality's suggestion, he does not contend that it is itself a *per se* violation.

emphasized, such discrimination 'not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.' *Smith* v. *Texas*, 311 U. S. 128, 130 (1940) (footnote omitted). The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole. 'The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.' *Ballard* v. *United States*, 329 U. S. 187, 195 (1946)." (Emphasis added.)

The plurality's assertion that Teague's claim fails to fit within Justice Harlan's second exception is also questionable. It bears noting that Justice Powell, long a staunch advocate of Justice Harlan's views on the scope of collateral review, leaned to the opposite opinion: "Whenever the fairness of the petit jury is brought into question doubts are raised as to the integrity of the process that found the prisoner guilty. Collateral relief therefore may be justified even though it entails some damages to our federal fabric." *Rose* v. *Mitchell*, *supra*, at 584, n. 6 (Powell, J., concurring) (citation omitted). Justice Jackson rightly observed:

"It is obvious that discriminatory exclusion of Negroes from a trial jury does, or at least may, prejudice a Negro's right to a fair trial, and that a conviction so obtained should not stand. The trial jury hears the evidence of both sides and chooses what it will believe. In so deciding, it is influenced by imponderables—unconscious and conscious prejudices and preferences—and a thousand things we cannot detect or isolate in its verdict and whose influence we cannot weigh. A single juror's dissent is generally enough to prevent conviction. A trial jury on which one of the defendant's race has no chance to sit may not have the substance, and cannot

have the appearance, of impartiality, especially when the accused is a Negro and the alleged victim is not." *Cassell* v. *Texas*, 339 U. S. 282, 301–302 (1950) (dissenting opinion).

More recently, in *Vasquez* v. *Hillery*, 474 U. S., at 263, we expressly rejected the claim that "discrimination in the grand jury has no effect on the fairness of the criminal trials that result from that grand jury's actions." Because "intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the State to prevent," *id.*, at 262, we reaffirmed our decision in *Rose* v. *Mitchell, supra*, and held that a prisoner may seek relief on federal habeas for racial discrimination in the selection of the grand jury that indicted him and that such claims are not subject to harmlesserror review. Compelling the State to indict and try him a second time, we said, despite the heavy burdens it imposes, "is not disproportionate to the evil that it seeks to deter." 474 U. S., at 262. The plurality's assertion that an allegation, like Teague's, of discrimination in the selection of the *petit* jury—with far graver impact on the fundamental fairness of a petitioner's trial than the discrimination we condemned in *Hillery*—is too tangentially connected with truth finding to warrant retroactive application on habeas corpus under its new approach therefore strains credibility.

## IV

A majority of this Court's Members now share the view that cases on direct and collateral review should be handled differently for retroactivity purposes. See *Griffith* v. *Kentucky*, 479 U. S. 314 (1987); *Allen* v. *Hardy*, 478 U. S. 255 (1986) *(per curiam); Williams* v. *United States*, 401 U. S. 646, 665 (1971) (opinion of MARSHALL, J.). In *Griffith*, the Court adopted Justice Harlan's proposal that a new rule be applied retroactively to all convictions not yet final when the rule was announced. If we had adhered to our precedents,

reached Teague's Sixth Amendment claim, and ruled in his favor, we would ultimately have had to decide whether we should continue to apply to habeas cases the three-factor approach outlined in *Stovall* v. *Denno*, 388 U. S., at 297, or whether we should embrace most of the other half of Justice Harlan's proposal and ordinarily refuse to apply new rules retroactively to cases on collateral review, except in the cases where they are announced.

In my view, that is not a question we should decide here. The better course would have been to grant certiorari in another case on collateral review raising the same issue and to resolve the question after full briefing and oral argument. JUSTICES BLACKMUN and STEVENS, *ante*, pp. 319–320, disagree. They concur in the Court's judgment on this point because they find further discussion unnecessary and because they believe that, although Teague's Sixth Amendment claim is meritorious, neither he nor other habeas petitioners may benefit from a favorable ruling. As I said in *Stovall* v. *Denno*, *supra*, at 301, according a petitioner relief when his claim prevails seems to me "an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum." But I share the view of JUSTICES BLACKMUN and STEVENS that the retroactivity question is one we need not address until Teague's claim has been found meritorious. Certainly it is not one the Court need decide *before* it considers the merits of Teague's claim because, as the plurality mistakenly contends, its resolution properly determines whether the merits should be reached. By repudiating our familiar approach without regard for the doctrine of *stare decisis*, the plurality would deprive us of the manifold advantages of deciding important constitutional questions when they come to us first or most cleanly on collateral review. I dissent.