Deborah C. WESTBURY, Petitioner,

v.

Kristine KRENKE, Warden, Taycheedah Correctional Institution, Respondent.

No. 99–C–0453.

United States District Court, E.D. Wisconsin.

June 26, 2000.

Mark Eisenberg, Madison, WI, for Petitioner.

Daniel O'Brien, Asst Atty. Gen., Madison, WI, for Respondent.

## DECISION AND ORDER

ADELMAN, District Judge.

Deborah C. Westbury petitions for a writ of habeas corpus pursuant to 28 U.S.C. 2254. Petitioner raises two grounds for relief: (1) that she was subjected to multiple punishments for the same offense in violation of the protection against double jeopardy as provided by the Fifth and Fourteenth Amendments, and (2) that the combined effect of a number of erroneous evidentiary rulings by the trial court resulted in a violation of due process of law as guaranteed by the Fifth and Fourteenth Amendments.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

On August 12, 1994 the State of Wisconsin charged petitioner with various violations of the Controlled Substances Act, Wis.Stat. ch. 161.[2] Count one charged petitioner with possession with intent to deliver cocaine base (crack cocaine) on or about November 1, 1993, through and including December 24, 1993, under Wis. Stat. §§ 161.41(1m)(cm) and 161.14(7)(a), as a party to a crime. Effective December 24, 1993, § 161.14(7)(a), which referred specifically to cocaine base, was repealed and § 161.41(1m)(cm) was amended to include possession with intent to deliver both cocaine base and cocaine, and the penalty structure for the amended § 161.41(1m)(cm) was altered. 1993 Wis. Act 98 §§ 85, 86, 96g.[3]

The amended statute was the basis for count two, possession with intent to deliver more than forty grams of cocaine on or about December 25, 1993, through and including April 23, 1994, as party to the crime. Petitioner was also charged with

---

1. Some of the facts are taken from the decision of the Wisconsin Court of Appeals. (*See* Resp't's Ans.Ex. B.)

2. At the time of petitioner's prosecution and conviction the Controlled Substances Act was Chapter 161. It has since been renumbered Chapter 961.

3. The amended version, Wis.Stat. § 161.41(1m)(cm) (1993–94), provided, in pertinent part:

 Except as authorized by this chapter, it is unlawful for any person to possess, with intent to manufacture, or deliver, a controlled substance.... Any person who violates this subsection with respect to:

 (cm) A controlled substance under sec. 161.16(2)(b) [cocaine, which no longer excepts cocaine base], is subject to the following penalties:

 4. If the amount possessed, with intent to manufacture or deliver, is more than 40 grams but not more than 100 grams, the person shall be fined not more than $500,000 and shall be imprisoned for not less than 5 years nor more than 30 years.

possession with intent to deliver cocaine on or about April 26, 1994 as a party to the crime and maintaining a dwelling used to keep controlled substances, contrary to Wis.Stat. § 161.42.[4] She was convicted of all four counts.[5] Subsequently, the trial court sentenced her to ten years of imprisonment on counts one and two with the sentences to run consecutively, plus periods of probation on the other two counts.

## A. Evidence Relating to Double Jeopardy Claim

During the trial the state presented evidence regarding petitioner's involvement in purchasing, processing and selling cocaine base during the time period from November 1, 1993 through April 23, 1994, the time period relevant to counts one and two.

Tyrees Scott testified that while he was visiting petitioner's house on December 23, 1993, he observed her sell crack cocaine. Scott knew it was before Christmas because he saw wrapped presents under the Christmas tree. Scott also testified that he sold cocaine base for petitioner and Stacey Miller ten or twelve times or more from late December 1993 or early January 1994 through the middle of February 1994. Scott specifically stated that petitioner, rather than Miller, gave him crack cocaine two or three times in the middle of January 1994. In January or February 1994 Scott assisted petitioner and Miller in manufacturing and packaging crack cocaine in petitioner's basement. He also accompanied petitioner and Miller to Chicago to obtain cocaine on three occasions in January 1994.

Detective John Summers testified that Miller told him petitioner paid Miller to purchase cocaine for petitioner to sell to her customers. Miller told Detective Summers this occurred several times prior to a personal falling out with petitioner in December 1993. Miller said he and petitioner patched up their differences in late 1993 and resumed doing business together.

Detective Alan Rickey testified that he interviewed Seri Harris, a long-time friend of petitioner whom petitioner paid to clean her house and help in the daycare center she ran in her home. Harris told Detective Rickey that she knew petitioner was dealing drugs while she was employed by petitioner, which was from mid–1993 to April 1994.

## B. Evidence Relating to Evidentiary Rulings

Susan Kordosky, a witness for the state, testified that she purchased cocaine from petitioner at petitioner's house on several occasions in 1992 and early 1993. Petitioner's counsel attempted to weaken the impact of this testimony by introducing evidence of Kordosky's reputation for dishonesty under Wis.Stat. § 906.08, through the testimony of Seri Harris. During the cross-examination of Harris, who had been in drug treatment programs with petitioner for four or five years, petitioner's counsel asked whether Harris knew of Kordosky's reputation in the community for honesty. The trial court sustained the state's objection, apparently basing its ruling on the conclusion that the recovery community is not a community from which reputation evidence could be admitted. The state court of appeals held that this ruling was error.

Petitioner also attempted to bring in evidence of Kordosky's character for dishonesty through her probation agent, who would have testified that in his opinion, based on his experience with Kordosky

---

4. All four of the counts discussed in this opinion were enhanced under the repeat offender provision, Wis.Stat. § 161.48(3), and counts one through three were enhanced under Wis. Stat. § 161.49 as crimes committed within 1,000 feet of a youth center because petitioner ran a daycare center in her home.

5. Petitioner was also charged and convicted of possession of cocaine without a tax stamp but the conviction was dismissed by the trial court pursuant to *State v. Hall*, 207 Wis.2d 54, 557 N.W.2d 778 (1997).

over several years, she was untruthful. The trial court also excluded this testimony, and the court of appeals ruled that the exclusion was error.

Additionally, on cross-examination petitioner's counsel asked Kordosky whether she had ever been involved with the intentional falsification of information to which Kordosky answered "no." However, two of Kordosky's seven prior criminal convictions, forgery in 1981 and uttering in 1988, arguably involved the intention to falsify information. The trial court did not allow counsel to conduct any further cross-examination on the conduct resulting in the two convictions. The court of appeals held that the trial court's ruling was erroneous with respect to the 1988 conviction because this conviction was sufficiently recent to be probative.

Detective Mary Ricksecker testified that Kordosky told her she purchased cocaine from petitioner in the past, said she knew cocaine was available at petitioner's house, and revealed details about two specific drug purchases and the layout of petitioner's house. Petitioner objected to Detective Ricksecker's testimony on hearsay grounds, but the trial court admitted it. The court of appeals held that this ruling also was erroneous.

The court of appeals, however, ruled that the trial court's evidentiary errors were harmless because there was no reasonable possibility that they contributed to petitioner's conviction.

## II. STANDARD OF REVIEW

Petitioner filed her federal petition for habeas corpus subsequent to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") thus the provisions of the Act apply to her case. *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 1486, 146 L.Ed.2d 435 (2000). Title 28 U.S.C. § 2254(d) as amended by AEDPA provides that habeas relief shall not be granted unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

To secure a writ under § 2254(d)(1), petitioner first must show that the Supreme Court had "clearly established" the propositions essential to her position at the time of the challenged state court decision. *Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir.1999) (citing *Mueller v. Sullivan*, 141 F.3d 1232, 1234 (7th Cir. 1998)). With one caveat, whatever would qualify as an old rule under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), will constitute clearly established federal law under § 2254(d)(1). *Williams*, 529 U.S. at ——, 120 S.Ct. at 1523. *Teague* stated that a petitioner is not entitled to federal habeas relief if relying on a new rule of federal law not announced until after her state conviction became final, *Teague*, 489 U.S. at 310, 109 S.Ct. 1060 (O'Connor, J.); thus, petitioners must have an "old" rule upon which to rely. A rule is not old or clearly established unless it was dictated by then-existing precedent. *See id.* at 301, 109 S.Ct. 1060 (O'Connor, J.); *Schaff*, 190 F.3d at 522 (quoting *Saffle v. Parks*, 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990)); *see also Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir.1998) (concluding that a rule is clearly established "if Supreme Court precedent would have compelled a particular result in the case"). The caveat, of course, is that § 2254(d)(1) restricts the source of clearly established law to Supreme Court jurisprudence. *Williams*, 529 U.S. at ——, 120 S.Ct. at 1523. And the rule must come from the holdings, not the dicta, of the Court as of the time of the relevant state-court decision. *Id.* Therefore, a petitioner first must be able to point to a specific Supreme Court decision that supports her claim under § 2254(d)(1), and that decision must

have clearly established the relevant principle as of the time of her direct appeal. *Schaff,* 190 F.3d at 522 (citing *Yancey v. Gilmore,* 113 F.3d 104, 106–07 (7th Cir. 1997))..

■ Next the petitioner must demonstrate that the state court's decision was either "contrary to" or "involved an unreasonable application of" the clearly established Supreme Court jurisprudence. *Williams,* 529 U.S. at ——, 120 S.Ct. at 1523. A state ruling is "contrary to" Supreme Court precedent (1) "if the state court arrives at a conclusion opposite. to that reached by [the Supreme] Court on a question of law," or (2) "if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.; see also id.* at ——, 120 S.Ct. at 1519–20. A state ruling is "an unreasonable application of" precedent "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at ——, 120 S.Ct. at 1523. A "federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at ——, 120 S.Ct. at 1521. Congress used "unreasonable," not "erroneous" or "incorrect," however; a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at ——, 120 S.Ct. at 1522.

■ I must presume that the state courts' factual findings are correct. 28 U.S.C. § 2254(e)(1). This presumption may be rebutted only by clear and convinc-

ing evidence. *Id.; Foster v. Schomig,* 223 F.3d 626, 630 (7th Cir.2000).

## III. DOUBLE JEOPARDY

### A. Applicable Law

■ The double jeopardy clause of the Fifth Amendment provides that the government shall not put a person in jeopardy of life or limb twice "for the same offence." U.S. Const. amend. V. The protection against double jeopardy is enforceable against the states through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The double jeopardy clause affords a defendant three basic protections: (1) protection against successive prosecution for the same offense after acquittal; (2) protection against successive prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). In the present case petitioner argues that the third protection, that against multiple punishments for one offense, was violated.

■ The problem of determining whether two offenses are the same for the purpose of establishing whether multiple punishments are permitted arises in two different contexts. One is the "double description" context, where the question is whether two statutes describe two separate offenses or are merely different descriptions of the same offense. *See Gore v. United States,* 357 U.S. 386, 392, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). The second is the "unit of prosecution" context, where the question is whether a course of conduct that violates one statute may be divided into separate charges covering different temporal periods. The potential for multiple punishments exists in both situations.[6]

---

**6.** The prohibition against multiplicitous charges is at least in part based on a theory that such charges can be prejudicial to the

defendant on the issue of guilt or innocence. In contrast multiple punishment does not involve this problem because the issue of guilt

■ Moreover, in both situations the purpose of the component of the double jeopardy clause which protects a defendant against cumulative punishments is to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. *Ohio v. Johnson,* 467 U.S. 493, 499, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984). Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question of whether punishments are multiple for double jeopardy purposes is essentially one of legislative intent. *Missouri v. Hunter,* 459 U.S. 359, 366–68, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983).

■ The question of what punishment is constitutionally permissible thus merges with the question of what punishment the legislature intended to allow. *Albernaz v. United States,* 450 U.S. 333, 344, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). However, in exploring legislative intent a court must be aware of the rule of lenity. The rule of lenity is a canon of statutory construction. The Supreme Court explained the rule as follows in regard to federal legislation:

> When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. And this is not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or anti-social conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment. This in no wise implies that language used in criminal statutes should not be read with the saving grace of common sense.... It

merely means that if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses....

*Bell v. United States,* 349 U.S. 81, 83–84, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

In a case raising the question of whether multiple punishments were imposed in violation of the double jeopardy clause, it makes sense to treat the rule of lenity as a presumption against multiple punishments, which may be rebutted by a showing of legislative intent to the contrary. Peter Westen & Richard Drubel, *Toward the General Theory of Double Jeopardy,* 1978 Sup.Ct.Rev. 81, 116; *see Jeffers v. United States,* 432 U.S. 137, 155, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) ("The critical inquiry is whether Congress intended to punish each statutory violation separately.... If some possibility exists that the two statutory offenses are the 'same offense' for double jeopardy purposes, however, it is necessary to examine the problem closely, in order to avoid constitutional multiple-punishment difficulties."); *see also Iannelli v. United States,* 420 U.S. 770, 791, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975) (stating that presumption rebutted by showing of "clear and unmistakable" legislative intent that conspiracy and substantive violation be punished as multiple offenses).

■ The presumption against multiple punishments is similar to the constitutional presumption utilized by the Supreme Court in *Pearce* that ambiguities in judicial sentences be resolved in favor of defendants in order to avoid the risks of double punishment. Westen & Drubel, *supra,* at 118 n. 174. However, in ascertaining legislative intent a court must examine all

or innocence has already been determined. *See* Charles A. Wright, *Federal Practice & Procedure: Criminal 2d* § 142 (1982). Multiplicity is commonly defined as the charging of a single offense in multiple counts, which thus subjects a defendant to multiple convictions and punishments for what is actually a single offense. Multiple punishment refers to the conviction and sentencing stage, not the

pleading stage. Multiple punishment, therefore, does not control the number of charges that can be lodged, but only the number of charges for which a defendant can be convicted and punished. *See* Michelle Leslie, Note, *State v. Grayson: Clouding the Already Murky Waters of Unit of Prosecution Analysis in Wisconsin,* 1993 Wis.L.Rev. 811, 812 n. 3.

sources from which such intent may be drawn and only if legislative intent remains ambiguous will the presumption of lenity require the imposition of a single punishment. *Leonard v. Warden, Dodge Correctional Inst.,* 631 F.Supp. 1403 (E.D.Wis.1986), *aff'd,* 819 F.2d 1143 (7th Cir.1987).

■ Thus, while the double jeopardy clause does not limit what punishment the legislature may impose, it does require that if the legislature desires cumulative punishment it must make its intention clear. Although designed as a protection against prosecutorial and judicial abuse, the double jeopardy clause acts as an indirect restraint on the legislature, because it demands a certain standard of clarity from the legislature before multiple punishment will be allowed. Westen & Drubel, *supra,* at 118; *see, e.g., United States v. Handford,* 39 F.3d 731, 735 (7th Cir.1994) (stating that legislature must have "adequately expressed its desire for cumulative punishment").

■ Generally speaking, in considering a question of legislative intent I am bound by a state court's interpretation of its own state's laws. *See O'Brien v. Skinner,* 414 U.S. 524, 531, 94 S.Ct. 740, 38 L.Ed.2d 702 (1974). In the multiple punishment context, however, the question of legislative intent merges with the question of whether a given punishment is consistent with the protection against double jeopardy. Yet the question of what the double jeopardy clause requires is a federal constitutional question that I decide independently of the state courts. *Hunter,* 459 U.S. at 368, 103 S.Ct. 673. Thus, while I am generally bound by a state court's pronouncements regarding legislative intent, I nevertheless have the independent duty and power to ensure that the legislature's intent to permit multiple punishments is sufficiently clear, for constitutional purposes, to override the presumption in favor of single punishment.

**B. Analysis of Petitioner's Double Jeopardy Claim**

Petitioner argues that the prosecutor arbitrarily chose to divide one continuing course of conduct into two units of prosecution, each covering a separate period of time. She contends that her possession of cocaine with intent to sell during the period between November 1, 1993 and April 23, 1994 constituted a continuing offense that should have been charged in a single count. It follows, she asserts, that the separate convictions and consecutive sentences on counts one and two constitute multiple punishments in violation of the protection against double jeopardy. Thus the question is whether, on the facts of this case, the prosecutor's decision to divide petitioner's possession of cocaine into two units of prosecution resulting in two convictions and sentences was consistent with legislative intent.

■ Respondent argues that in ascertaining legislative intent I should utilize the test set forth in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The *Blockburger* rule is that where the same act or transaction constitutes a violation of two distinct statutes the test to be applied to determine whether there are two offenses or one is whether each provision requires proof of a fact which the other does not. *Id.* at 304, 52 S.Ct. 180. *Blockburger* concerns the "double description" problem. Petitioner's claim, however, is not that she was charged with violating two distinct statutory provisions describing the same offense, but rather that the prosecutor wrongly charged her with two separate violations of the same statute—the "unit of prosecution" problem. Petitioner contends that counts one and two both charge a violation of § 161.41(1m)(cm) and the changes made to § 161.41(1m)(cm) by 1993 Act 98—combining cocaine base and cocaine in one statute and revising quantities of cocaine that relate to specific penalty ranges—simply altered the penalty structure and did not affect the elements of the crime. I

agree with petitioner that for purposes of determining whether the prosecutor wrongfully divided a single course of conduct into two offenses it is reasonable to regard both counts one and two as charging violations of the same statute, a statute prohibiting possession of cocaine base with intent to sell.

■ Therefore, the *Blockburger* test, suggested by respondent, is inapplicable. The *Blockburger* test is a tool of statutory construction used to determine whether a legislature intended the imposition of multiple punishments where conduct violates more than one statute, i.e., in double description rather than unit of prosecution cases.[7] In unit of prosecution cases involving the same rather than distinct statutory provisions, I must ascertain legislative intent through evidence such as the language of the statute; the legislative history, if the language of the statute is ambiguous; and the interpretation of the statute by the state's highest court. *See United States v. Song*, 934 F.2d 105, 108 (7th Cir.1991). If, after considering these sources, I find that the legislature's intent is ambiguous, the presumption against multiple punishments would remain unrebutted and cumulative sentences would violate double jeopardy.

The Supreme Court precedent on which petitioner relies in making her double jeopardy argument is *In re Snow*, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887). To a lesser extent petitioner also relies on *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), where the Court said "[t]he Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the sim-

ple expedient of dividing a single crime into a series of temporal or spacial units." In *Snow* the defendant, who had seven wives, was convicted of violating a federal statute prohibiting a man from cohabiting with more than one woman in federal territories, including Utah, where he lived. The government charged the defendant in a three-count indictment with each count covering cohabitation during a different time period. The first count charged continuous cohabitation during 1883; the second count charged the same during 1884; and the third count charged the same for the first eleven months of 1885. The defendant was convicted on all three counts and sentenced to consecutive periods of imprisonment on each count. On appeal, the Supreme Court held that illegal cohabitation is an inherently continuing offense rather than an isolated act. Thus, the defendant could only be held accountable for one offense between the first day of the cohabitation and the end of the continuous time period covered by the three charges.

There is undoubtedly a distinction between an offense that is continuous in character like cohabitation and an offense that is complete upon the performance of a single act. *Blockburger*, 284 U.S. at 302, 52 S.Ct. 180. For example, a statute punishing engaging in the business of selling illegal drugs would be directed at a continuing offense but a prohibition of the sale of drugs would be directed at a single act. *Id.*

■ Petitioner argues that possession of narcotics, like cohabitation, is an inherently continuing offense. The statute provides that "it is unlawful for any person to *possess*, with intent to manufacture, or de-

---

7. The "identical in law and fact" test used by Wisconsin courts to analyze the question of double jeopardy, *see State v. Rabe*, 96 Wis.2d 48, 291 N.W.2d 809 (1980), is also uninformative in the continuing offense, unit of prosecution context. The identical in law portion is always satisfied and therefore never determinative, since by definition each charge is brought under the same statutory provision. The identical in fact portion is equally useless because the prosecutor will have divided the continuing conduct into temporal segments. Obviously, the facts occurring in each temporal segment will never be exactly the same. Thus, the identical in law and fact test tells us nothing in unit of prosecution cases because the charges will always be identical in law and never identical in fact. Leslie, *supra,* 291 N.W.2d at 824.

liver, a controlled substance." Wis.Stat. § 161.41(1m)(cm) (1993–94). The word "possess" is a common term, *see* Wayne R. LaFave & Austin W. Scott Jr., *Substantive Criminal Law* § 3.2 at 281 (1986), meaning to have having physical control of a substance, *see* Wis. JI–Criminal 6030 (1999); *see also* Webster's New College Dictionary 861–62 (1995) ("defining "possess" as "[t]o have as property" and [t]o cause to have, hold or master something, as property"). A number of cases indicate that possession is a continuing offense lasting as long as the act of possession does. *See, e.g., United States v. Jones,* 533 F.2d 1387, 1391 (6th Cir.1976) ("[B]y prohibiting possession Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm."); *Johnson v. Morgenthau,* 69 N.Y.2d 148, 512 N.Y.S.2d 797, 505 N.E.2d 240, 242–43 (1987) (indicating that uninterrupted possession of a weapon over a six-day period constituted a continuous offense which could support only one prosecution for criminal possession); *State v. Zele,* 168 Vt. 154, 716 A.2d 833, 837 (1998) (holding that crime of narcotics possession was continuing offense).

However, the definition of "possess" as used in the language of the statute, even as interpreted in these cases involving similar language, also indicates that separate charges may be justified when there are separate acts of possession—separate holdings of separate property, separate acts of dominion, noncontinuous or interrupted possession. Importantly, the Wisconsin Supreme Court has interpreted the Wisconsin possession law as permitting separate prosecutions where the charges are based on separate acts of possession separated by a period of time. *State v. Stevens,* 123 Wis.2d 303, 322–323, 367 N.W.2d 788 (1985). In *Stevens* the defendant was charged with two counts of possessing drugs, one involving possession on December 29 and the second involving possession on December 30. The two charges resulted from the same supply of drugs. The supreme court rejected a double jeop-

ardy claim, reasoning that even though the drugs involved in both counts came from a single acquisition the state properly charged two counts because the defendants separated some of the drugs out for personal use and hid them from the police.

Thus, while possession of narcotics can be a continuing offense, based on the definition of possess and the Wisconsin Supreme Court's interpretation of the statute in a double jeopardy challenge, the legislature's intent that separate acts of possession separated by an interval of time may be punished separately is clear.

 In the present case the state courts determined that the record supported the jury verdict that petitioner committed separate acts of possession of cocaine before and after December 25, 1993, the date dividing counts one and two. The court of appeals stated:

> The events underlying Westbury's conviction on counts one and two are separated by time.... There is sufficient evidence in the record for a jury to find a violation of § 161.41(1m)(cm), Stats., in each of these time periods, and ... each time period involved evidence of several distinct actions by Westbury that violate § 161.41(1m)(cm)....

(Resp't's Ans.Ex. B at 6–7 (footnote omitted)). According to the court, "counts one and two each include several distinct acts of possession with intent to deliver with different supplies, different suppliers and different customers." *Id.* at 8 n. 9.

The evidence supports this conclusion. For example, Scott testified that he personally observed petitioner sell crack cocaine several days before Christmas 1993, during the time period covered by count one. (Resp't's Ans.Ex. G, Doc. 102 at 51–54, 57–58.) Scott also testified that in January and February, 1994, during the time period covered by count two, petitioner and Miller set up a laboratory to produce crack cocaine and obtained cocaine in Chicago, which they brought to Madison to

be sold. (*Id.* at 85–133.) Thus, the testimony supports the conclusion that petitioner committed separate acts of possession. In fact, in the state courts petitioner did not even argue that there was insufficient evidence to support her convictions on each count, (Resp't's Ans., Ex. B at 7 n. 7), and she does not directly raise such a claim here.

In support of her double jeopardy claim petitioner argues that the prosecutor herself viewed the case as involving a single conspiracy, which she charged in two counts only to accommodate the statutory change in penalties that took effect on December 25, 1993. And, in fact, the prosecutor told the jury that petitioner "is charged with, essentially a conspiracy starting in November of 1993, through and including the date of the search warrant, April 26th, 1994." (Resp't's Ans.Ex. G, Doc. 101 at 53.)[8] The prosecutor also advised the trial court that she charged petitioner in separate counts because of the statutory change. (Resp't's Ans.Ex. G., Doc. 99 at 150–51.)

However, neither the prosecutor's statement about her view of the case nor the reason for the prosecutor's charging decision appreciably strengthen petitioner's double jeopardy argument. As previously stated, the issue of double jeopardy turns solely on whether the legislature intended to permit cumulative punishments in a given fact situation. The Wisconsin legislature intended to permit separate punishments for ·separate acts of possession. Here, there was evidence that petitioner committed separate acts of possession in the time periods covered by counts one and two. Thus regardless of the prosecutor's view of the case or the possibility that she might have charged it differently had the statute not been amended, petitioner's double jeopardy claim must fail.

8. This statement was inaccurate both because petitioner was not charged with conspiracy and because it implied that petitioner was

## IV. EVIDENTIARY RULINGS

Petitioner argues that the combination of several erroneous evidentiary rulings by the trial court violated her right to a fair trial as required by the due process clause. Respondent does not dispute, and the court of appeals found, that the trial court made several mistaken rulings. However, respondent argues and the court of appeals agreed that the errors were harmless and did not make the trial so unfair as to violate due process.

In a habeas proceeding the standard for determining whether a trial error was harmful is whether it "had substantial and injurious effect or influence in determining the jury's verdict," resulting in actual prejudice to the defendant. *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). On collateral review, the error in question need not be harmless beyond a reasonable doubt; but if, in applying the above standard, I am "in grave doubt about the likely effect of an error on the jury's verdict," the trial error should be deemed harmful. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). As the Supreme Court has explained,

[h]armless-error review looks ... to the basis on which the jury *actually rested* its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

charged with a course of conduct rather than separate acts of possession.

*Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (internal quotation marks and citations omitted).

■ In the present case the record shows that the trial court's errors did not have a substantial and injurious effect on the jury's verdict. The erroneous evidentiary rulings all related to the credibility of prosecution witness Kordosky. The trial court erred in excluding two witnesses' opinions of Kordosky's credibility and evidence about Kordosky's conduct leading to a 1988 conviction, and in admitting Detective Ricksecker's testimony about a prior Kordosky statement. However, both because Kordosky's testimony was not critical to the state's case and because petitioner was able to demonstrate that Kordosky's credibility was questionable, the trial court's errors were harmless.

The court of appeals well summarized the impact of the errors on the verdict:

The errors all involve Westbury's attempts to impeach Kordosky and discredit her testimony—denying Westbury the opportunity to present evidence about Kordosky's reputation and character for dishonesty; denying Westbury the opportunity to cross-examine Kordosky on the conduct leading to the 1988 conviction for uttering; and erroneously admitting Detective Ricksecker's testimony of Kordosky's prior consistent statements. However, Kordosky's testimony did not provide any evidence directly supporting the elements of the crimes for which she was convicted. Kordosky testified that she purchased cocaine from Westbury in 1992 and early 1993, which is prior to the time period of the charges— November 1, 1993 through April 26, 1994. In contrast, the State presented ample evidence that did support the convictions: the testimony of Scott regarding cocaine trafficking on December 23, 1993, and in January and February of 1994; the statements Miller made to detectives regarding West-

bury's involvement in the cocaine business before and after December 1993; and the cocaine and other physical evidence consistent with processing and packaging crack cocaine found in Westbury's house and the cocaine residue found in her car on April 26, 1994.

Moreover, the jury did hear testimony that called Kordosky's credibility into question. She admitted she was a drug addict with five criminal convictions. She testified that she was in jail when she made her initial statements to the police. She also testified that she reviewed those statements and spoke with the district attorney's office in preparing for her testimony. We are persuaded that there is not a reasonable possibility that additional testimony impeaching Kordosky's character and credibility would have affected the jury's verdict. We are also persuaded there is not a reasonable possibility that Detective Ricksecker's erroneously admitted cumulative testimony on Kordosky's statement to the police contributed to the jury's verdict. We conclude the evidentiary errors were harmless.

(Resp't's Ans.Ex. B at 22–23 (footnote omitted).)

I fully agree with the court of appeals's assessment of the impact of the erroneous evidentiary rulings. The errors did not have a substantial and injurious effect in determining the jury's verdict resulting in actual prejudice to petitioner.

## V. CONCLUSION

The state courts' decisions were not contrary to and did not involve an unreasonable application of federal law as declared by the Supreme Court. For the foregoing reasons,

**IT IS HEREBY ORDERED** that petitioner's application for a writ of habeas

corpus is **DENIED** and this case is **DISMISSED.**